## WELLS AMUSEMENT CO., Inc., v. COMMISSIONER OF INTERNAL REVENUE.

### No. 3566.

Circuit Court of Appeals, Fourth Circuit.

April 5, 1934.

M. Carter Hall, of Richmond, Va. (C. C. Carlin, of Washington, D. C., on the brief), for petitioner.

Louise Foster, Sp. Asst. to Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., and J. Louis Monarch, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before PARKER and SOPER, Circuit Judges, and CHESNUT, District Judge.

SOPER, Circuit Judge.

This is a petition to review a decision of the Board of Tax Appeals, determining deficiencies in the income taxes of petitioner for the periods from August 1 to December 31, 1925, and from January 1 to July 31, 1926, and for the fiscal years ending July 31, 1927, 1928, and 1929, in the respective sums of $31.14, $1,878.16, $2,076.87, $2,012.26, and $1,912.29.

The only issues in the case were: (1) Whether the taxpayer realized a capital gain in the year 1926, under section 202 (a) and (c) and section 204 (a) of the Revenue Act of 1926, c. 27, 44 Stat. 9, 11, 12, 14, 26 USCA §§ 933 (a) and (c) and 935 (a),[1] upon the sale of certain stocks in that year, in part for cash and in part for serial promissory notes maturing annually over a period of ten years; and (2) whether further income was realized in the subsequent fiscal years, under sections 213 and 232 of the Revenue Act of 1926, 44 Stat. 23, 41, 26 USCA §§ 954 and 984, and sections 21 and 22 of the Revenue Act of 1928, c. 852, 45 Stat. 791, 797, 26 USCA §§ 2021, 2022,[2] when the notes due in those years were paid. The Board affirmed the Commissioner's prior determination of deficiencies, finding that the notes had a "fair market value" on May 3, 1926, when received by the taxpayer, of 45 per cent. of their aggregate face amounts.

Under the above sections of the 1926 act, relating to capital gains, the value of the notes was added to the amount of cash received, to arrive at the total amount realized on the sale, and a profit of $5,224.53 on the sale was computed for the year 1926. In each of the subsequent fiscal years, 55 per cent., the excess over the fair market value entering into the 1926 tax, of the amounts received on the notes falling due in those years, was held to be income, and the further deficiencies were assessed upon that basis. The taxpayer here contends both that there was

no substantial evidence to support the finding of the Board that the notes had a fair market value of 45 per cent. of their face amounts, or that there was any market for the notes; and that, even if such market value was established by the evidence, the excess over that value, realized on particular notes, could not be taxed as income in subsequent fiscal years until the aggregate market value of the notes, or the cost of the property transferred in exchange for them, had been fully recovered from the maker. These contentions will be considered in order.

The Board found, in substance, the following facts: The taxpayer is a Virginia corporation, which for over twenty years prior to 1926 had been engaged in the theatrical business in Richmond and Norfolk, principally as a holding company. It was closely associated with the Wilmer & Vincent Theatre Company of New York, hereinafter referred to as the Wilmer Company, in the operation of a chain of theaters in those cities. The business was carried on to a large extent through eleven subsidiary corporations. Five of these, one in Richmond and four in Norfolk, were owned entirely by the taxpayer and the Wilmer Company, each of which held 50 per cent. of the stock. In the other six, all in Richmond, 25 per cent. of the stock was held by the taxpayer and a like amount by the Wilmer Company, by A. F. Albee and by one Murdock. One company in each city was purely an operating company, and the other corporations owned or leased theaters which they sublet to the operating company. In Richmond, three small theaters were owned by one of the subsidiaries and other subsidiaries owned two large, modern theater buildings, on leased ground, and held leases on five other theaters. The Norfolk subsidiaries owned two large theater buildings on leased ground, and held leases on five others.

Early in 1925, the taxpayer received an

[1] "Sec. 202. (a) Except as hereinafter provided in this section, the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the basis provided in subdivision (a) or (b) of section 204 [section 935 of this title], and the loss shall be the excess of such basis over the amount realized. * * *

"(c) The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received." (USCA title 26, § 933(a, c).

"Sec. 204. (a) The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property." (USCA title 26, § 935(a).

[2] "Sec. 21. Net Income. 'Net income' means the gross income computed under section 22 [section 2022], less the deductions allowed by section 23 [section 2023].

"Sec. 22. Gross Income. 'Gross income' includes * * * gains or profits and income derived from any source whatever."

The provisions of the 1926 act in regard to net income are substantially similar.

offer of $900,000 from the Famous Players-Lasky Corporation, for its interest in the Norfolk and Richmond companies; but the transaction was not consummated because of the objections of Albee, who was head of the Keith-Albee Company, and controlled the vaudeville shown at several of the theaters. Towards the end of 1925, Albee and Murdock offered the taxpayer $750,000, but Albee again refused to complete the deal. At this time the taxpayer's officers became most anxious to sell, because Loew's, Inc., had made arrangements to enter the theatrical field in both cities, and had already begun the erection of a large theater in Norfolk, which was completed shortly after May 3, 1926. Upon failure of the sale to Albee and Murdock, the taxpayer was offered the same terms by the Wilmer Company, and an agreement to sell on those terms was reached in the spring of 1926.

Under the first agreement with the Wilmer Company, executed May 3, 1926, the taxpayer was to receive $750,000 for its stock, $250,000 in cash, and the balance in yearly installments of $50,000, evidenced by serial promissory notes bearing 6 per cent. interest, the last of which matured in 1936. The notes were executed, and the stock was transferred to the Wilmer Company, and placed in escrow with the Citizens' National Bank of Norfolk, as collateral security for the payment of the notes. It was found necessary, however, to modify this agreement when it was learned that the Wilmer Company could not otherwise obtain certain promised financial assistance upon which it relied as a means of completing the purchase. A banking firm in Boston had agreed to underwrite an issue of $1,000,000 of the Wilmer Company's no-par preferred stock, but declined on the ground that it had expected Albee and Murdock to assume half the purchase from the taxpayer. The situation was explained in a letter of July, 1926, from the Wilmer Company to the taxpayer's president, in which it was stated that the Boston firm would not go through with its agreement unless the annual deferred payments on the taxpayer's stock were reduced to $25,000, and that a receivership of the Wilmer Company would be inevitable unless the $1,000,000 issue of its preferred stock could be floated. Accordingly, the agreement with the taxpayer was modified, and it was agreed that each annual payment should consist of $25,000 in cash and a new note for $25,000 maturing May 3, 1936, in place of the originally contemplated cash payments of $50,000 per year. The total purchase price was also reduced by $25,000 to be deducted from the final payment, so that the total amount due on the promissory notes was $475,000, the figure employed by the Commissioner in computing market value. As a result of the modification, the Wilmer Company was enabled to carry out its preferred stock issue, and obtained the $1,000,000 from the Boston firm.

The net result of this transaction was that the taxpayer received $250,000 in cash, and notes of a face value of $475,000 in 1926. The market value of these notes, at 45 per cent., was $213,750, so that on such basis the total realization in 1926 was $463,750; and, by deducting therefrom the cost of acquiring the stock sold, $458,525.47, a profit in 1926 of $5,224.23 was arrived at by the Commissioner, as has been stated. Five annual payments of $25,000 each had been made on May 3d in each year from 1927 to 1931, and the Commissioner had determined that $13,750 of this amount in each of the years 1927, 1928, and 1929 was income, when the case was heard by the Board on March 1, 1932.

In connection with the issue as to the market value of the notes as of May 3, 1926, the Board found a number of additional facts. The July 31, 1926, balance sheet of the Wilmer Company, maker of the notes, indicated a capital of $100,000 and a surplus of $1,394,844.85. The consolidated net taxable income of the Wilmer Company and its subsidiaries for the fiscal year ending July 31, 1926, was $210,072. Of the ten subsidiaries whose operations enter into this figure, four in Richmond and Norfolk, and six in Pennsylvania, eight showed losses for the year in varying amounts. The net taxable profit of the Wilmer Company individually was $299,471.24, of which $162,980 represented a profit derived from the sale of capital assets, leaving net profits from current operations of $136,491.24. The consolidated net profit from current operations was thus $47,092, and federal income taxes for the year amounted to $27,922. There was in addition an item of $82,160.95, representing nontaxable dividends received by the Wilmer Company on the stock which it owned in other companies. The Board concluded, from the above facts, including the balance sheet, that the notes were made by a solvent company and had substantial value when given.

The Board made a careful analysis of the balance sheets of the corporations whose capital stock was held in escrow as collateral for the payment of the notes. The aggregate net worth of these corporations was shown by their books to be $1,212,369.74, and on

that basis the shares held as collateral had a book value of $461,982.76. It was concluded, with special view to the fact that the taxpayer's president testified at the hearing, that the sale price of $750,000 did not represent the owner's opinion of the value of the stocks, but was accepted because it was believed to be the most that could be gotten, that the value of the stocks was not materially less at the time of the sale than their book value.

The Board also gave consideration to certain unfavorable circumstances bearing upon the value of both the notes and the collateral. It found that the theater business is particularly hazardous and its profits highly speculative; and that its success depends entirely upon the good will and favor of the public. Up to 1925 the taxpayer and its allied interests had practically sole control of the theatrical business in Richmond and Norfolk, and the entrance of Loew's, Inc., into the field after that time threatened to impair the good will of their enterprise, and hence diminished the value of the collateral. These conditions also rendered the notes highly speculative in character.

The taxpayer made some effort to sell the notes through its local broker and banker in Norfolk. The broker wrote to houses in Richmond, Baltimore, Boston, and New York which dealt in more or less speculative securities, submitting somewhat meager information as to the notes and security behind them, and offering them without recourse, and without any quotation of price. He was familiar with the theatrical business only in a general way, and had never dealt in the notes of theatrical companies. Obtaining no offer for the notes, he wrote the taxpayer in August, 1926, that in his opinion and that of his correspondents the notes had no market value at the time. He testified, however, that he could not recall the name of his correspondents, and that in his opinion the notes had a value of 25 per cent. of their face in 1926. The banker sent similar information to two correspondent banks in New York, but no offer was received. He had had no contact with people that buy speculative securities. He testified that the notes perhaps had a value of 25 per cent. of their face in 1926. The notes were not listed on any public or private exchange, and no private sales of them were made. The Board did not regard this evidence as sufficient to establish the fact that there was no market for the notes, and reached the conclusion upon all the evidence that a fair market value of 45 per cent. of the face value was reasonable and fully justified.

The taxpayer has earnestly contended in this court that there was no substantial evidence to justify the Board in rejecting the opinion of witnesses offered by the taxpayer to the effect that there was no market for the notes. It insisted that the Wilmer Company, the maker of the notes, was insolvent when they were given, and that the collateral behind them was worth materially less than its book value. An exhaustive analysis was submitted of the balance sheets of the Wilmer Company and of the corporations whose stock constituted the collateral. It was contended that two of the largest items on the balance sheet of the Wilmer Company, to wit, accounts receivable, $306,808.70, and stock of subsidiaries, $1,154,205.54, were carried at an excessive valuation which, if written down to a proper figure, would nearly wipe out the surplus of $1,394,844.85 which the balance sheet showed. This argument is based upon the showing that the current liabilities of the subsidiaries of the Wilmer Company exceeded their current assets, exclusive of amounts owed to the parent company, by $306,504.55, and that the value of the stocks of the subsidiaries was substantially less than the figure at which they were carried as an asset of the parent company. It was also pointed out that the current liabilities of that company exceeded the current assets. Of the Richmond and Norfolk companies whose stock was held as collateral, six showed an excess of current assets over current liabilities of $39,149.41; and four of them showed an excess of current liabilities over current assets of $87,664.47. Three of the theaters owned by these companies were obsolete and one was closed, and some of the leases on other theaters were of short duration.

The evidence, however, was far from establishing that the notes had no market value, or that the collateral was without substantial value. The contentions of the taxpayer must fail because the fact is ignored that the group of companies with which we are concerned constituted a going concern with substantial good will. Individual companies, maintained for the purpose of leasing theaters to the operating companies, may not have been in sound financial condition; but nevertheless the facts justify the conclusion that the corporations involved had a substantial net worth. It has been shown that the Wilmer Company had a net income for the fiscal year ending July 31, 1926, of $136,491.24, which exceeded the losses of the wholly owned subsidiaries by the sum of $47,092, without taking into account nontaxable divi-

dends of $82,160.95. The need of current assets was obvious; but, prior to the sale of the stock by the taxpayer, the Wilmer Company had arranged to sell an issue of its preferred stock at $1,000,000, a transaction which itself was strong evidence of its financial condition. Moreover, it continued in business paying the annual installments as they came due for five years after the purchase was completed. Hence there was ample evidence to support the Board's finding that the Wilmer Company was solvent. Similarly, evidence of substantial value in the collateral is found in the fact that experienced business men, thoroughly familiar with the affairs of the companies, agreed to pay $750,000 for the stock, and actually paid $250,000 in cash and delivered their notes for the balance.

The notes which the taxpayer received were indeed of a speculative value; but the evidence does not rebut the presumption that the Commissioner was right in his determination that they were possessed of market value. It is common experience that a market exists for the notes of corporations in active business, especially when secured by collateral. Witnesses for the taxpayer themselves valued the notes at approximately 25 per cent. of their face value; and the unsuccessful attempts of the banker and broker above mentioned, neither of whom had experience with securities of this kind, to make sale of the notes in 1926, does not conclusively establish that there was in fact no market for them. Whether or not there was an ascertainable fair market value of the property, and what that value was, were questions of fact as to which the determination of the Commissioner was prima facie correct, and the findings of the Board of Tax Appeals may not be reviewed when supported by substantial testimony. Phillips v. Commissioner, 283 U. S. 589, 600, 51 S. Ct. 608, 75 L. Ed. 1289; Wright v. Commissioner (C. C. A.) 50 F.(2d) 727; Anchor Co. v. Commissioner (C. C. A.) 42 F.(2d) 99, 100; Guy v. Commissioner (C. C. A.) 35 F.(2d) 139. The determination of market value usually involves an element of judgment and discretion, to be exercised in view of all the circumstances of the particular case, and a decision of the Board which finds support in factors of intrinsic value appearing from the record, will be sustained, even though at variance with the uncontradicted opinion of experts. Wright v. Commissioner, supra; Anchor Co. v. Commissioner, supra; Uncasville Mfg. Co. v. Commissioner (C. C. A.)

55 F.(2d) 893, 897; Crowell v. Commissioner (C. C. A.) 62 F.(2d) 51.

We cannot agree with the contention of the taxpayer on the second issue that no part of the annual deferred payments could be considered income until the full amount of the cost of the stocks sold had been received. Although the notes were speculative in value, they did not acquire that character by reason of any contingency in the promise to pay, and therefore the case is distinguishable from Burnet v. Logan, 283 U. S. 404, 51 S. Ct. 550, 75 L. Ed. 1143, where the promise for future money payments was wholly contingent upon uncertain events, and had no fair market value. Since a fair market value was attributable to the notes in the pending case at the time of their execution, the taxpayer actually realized that value in the eyes of the law. Since the property was not sold, but held in the expectation of future profit, it assumed the nature of an investment, and any amount received in excess of prior realization was income. The taxpayer's realization at the time the notes were acquired was 45 per cent. of their value, and the additional 55 per cent. realized when the yearly notes were paid clearly constituted additional income. A similar result has been reached in Ruth Iron Co. v. Commissioner (C. C. A.) 26 F.(2d) 30.

The decision of the Board of Tax Appeals is affirmed.