### BROOKS v. WILLCUTS, Collector of Internal Revenue.
### No. 2559.

District Court, D. Minnesota, Third Division.
Aug. 1, 1934.

E. S. Stringer (of O'Brien, Horn & Stringer), of St. Paul, Minn., for plaintiff.

Linus J. Hammond, Asst. U. S. Atty., of St. Paul, Minn., and P. E. Miller, Sp. Atty., of Bureau of Internal Revenue, and Ray Johnston, Atty., for Bureau of Internal Revenue, both of Washington, D. C., for defendant.

JOYCE, District Judge.

The burden here is upon the plaintiff and he rests his position upon the regulations of the Treasury Department, Article 13 (1), Regulation 70 (1929), which reads as follows:

"The value of all property includable in the gross estate is the fair market value thereof at the time of the decedent's death. The fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell."

Section 302 of the Revenue Act of 1926 (26 USCA § 1094) provides that the tax shall be levied upon "the value at the time of his death of all property. * * *" It does not define as do the regulations the word "value." The historical background of the regulation is not important, but section 302 of the Revenue Act of 1924 (26 USCA § 1094 note) was re-enacted into section 302 of the Revenue Act of 1926 (26 USCA § 1094). Section 3 of Article 13, Regulation 70 (1929), provides (inserting numbered paragraphs for convenience) as follows:

"(1) The value of a stock listed on an exchange is the mean between the high and low sales on the date of death, or if the deceased died on Sunday, or on a day when there were no sales, the mean between the high and low on the nearest day to death.

"(2) The value of a stock dealt in actively by brokers, or which has an active market, is the sale price at date of death, or nearest date, if within a reasonable time of death.

"(3) Securities in which there are occasional transactions, but which are not dealt in actively enough to clearly establish a fair market value, should be valued upon the basis of the nearest sale to the date of death, provided such sale was made in the normal course of business between a willing buyer and a willing seller and within a reasonable period of the date of the decedent's death.

"(4) Where securities are regularly quoted on a bid and asked price (even though there is no sale), the bid price is accepted as the value.

"(5) Where there is no active market, the executor may, within a reasonable time after death, make bona fide sales, and the price received will be accepted as the value.

"(6) Stock in a close corporation should be valued upon the basis of the company's net worth, earning and dividend-paying capacity, and all other factors having a bearing upon the value of the stock."

In determining the fair market value of the stock in question at the time of the death of Mr. Brooks, plaintiff contends that the stock should be valued under paragraph 3 dealing with "occasional transactions,"

whereas the government's position is that paragraph 6 controls, the same dealing with "net worth, earning and dividend-paying capacity," etc.

The Brooks-Scanlon Company at the time of Mr. Brooks' death had 38,270 shares outstanding, of which amount the Brooks and Scanlon families held upwards of 22,000 shares. It is a Delaware corporation organized about the year 1914 and carrying on its major operations in Florida. These consisted of extensive holdings of timber lands and the milling and sale of timber, with their plant located, prior to 1929, at Eastport, Fla., not far from Jacksonville. It was a highly successful business enterprise, efficiently managed. By virtue of certain rate increases promulgated by the Interstate Commerce Commission in the early part of 1929, the log rates intrastate were increased to approximately $8.50 per thousand feet, representing substantially 100 per cent. increase therein. Those in charge of the corporate management felt that this rate was prohibitive so far as it affected their operations at Eastport, and concluded to move and establish a new plant for their activities and to discontinue business at Eastport, which was done, with the building of a new mill and the establishment of a town at Foley, Fla., close to the timber holdings. The moving operation took substantially the balance of the year 1929 and represented a cost of something in excess of $550,000, which was cared for by company reserves. When Mr. Brooks died, the moving had been completed and the new mill constructed in what was regarded as an advantageous location with reference to the company's timber holdings.

The evidence disclosed that this company owned some 8,800 shares, or a 40 per cent. interest in a concern known as the Burton-Swartz Company, which dealt largely in cypress operations and which was, between the years 1925 and 1931, inclusive, a consistent payer of dividends. It appears that the income for the years 1925 to 1931, inclusive, from Brooks-Scanlon operations and Burton-Swartz dividends, augmented by large reserves, permitted a 10 per cent. dividend in 1925, 16 per cent. in 1926, 16 per cent. in 1927, 25 per cent. in 1928, 15 per cent. in 1929 (the year of the move), 10 per cent. in 1930, and 10 per cent. in 1931, notwithstanding losses during the last three years. It is to be observed that the 25 per cent. dividend in 1928 was permitted by reason of a payment by the government to the corporation of certain ship claims approximating $857,000.

These are mentioned to show the earning power and amount and regularity of the dividends of the corporation over the period indicated.

The stock holdings of the Brooks and Scanlon families reflect approximately 57 per cent. ownership of the stock. (See plaintiff's Exhibit F.) The stock was not traded in on any market or exchange. The sales before Mr. Brooks' death disclosed by the evidence were few, and with the exception of the sale of 50 shares at $135 were all made by members of the Paul family. I think the weight of evidence fairly justifies the conclusion that its business policy and activities were entirely dominated and controlled for every practical purpose by the ownership thus possessed and that it therefore comes within the definition of a close corporation appearing in McKim v. Odom, 3 Bland (Md.) 407, 416.

■ The record shows the following sales of stock:

| Date | No. of Shares | Price per Share | Total Price |
|---|---|---|---|
| Sept. 1929 | 97 | $125.00 | $12,125 |
| Sept. 1929 | 220 | 150.00 | 33,000 |
| Sept. or Oct. 1929 | 50 | 135.00 | 6,750 |
| Oct. 1929 | 221 | 140.00 | 30,940 |
| Aug. 1930 | 100 | 102.50 | 10,250 |

It is to be noted that the August, 1930, sale made by Mrs. Edna S. Paul to F. A. Chamberlain of Minneapolis was subsequent to the death of Mr. Brooks. The record is barren regarding the circumstances prompting this sale or of any of the above sales with the exception of the 220 and 221 items by the Paul brothers. There is, however, substantial evidence bearing on these two latter sales made by Mr. A. G. Paul and Mr. R. H. Paul, respectively. They were both interested in a concern known as the East Coast Lumber Company, of which one of the brothers was president and the other vice president. This concern had gone into receivership in 1929. A reading of their depositions leaves little room for doubt that these sales were compelled because of financial difficulty created by the failure of their own lumber enterprise, as well as the cessation of dividends theretofore paid in other concerns in which they were interested. Mr. R. H. Paul testified as to the difficulties he had in getting rid of the stock before he received the $140 price, and he stated he sold the stock because he needed the money for his individual benefit and business and that he was in need of cash, though not for the purpose of trying to save the East Coast Lumber Company from receivership.

Mr. A. G. Paul testified that he felt that he would need "a little income if the dividends on this Brooks-Scanlon stock were to be curtailed or passed for a few years and I started looking around to see what I could do with it." He also testified as to his need for cash at the time and the loss of dividends by virtue of the failure of the East Coast Lumber Company, as well as his desire to clean up a family obligation of something "like five or six thousand dollars," and that he "probably used some for living expenses and things like that." Their needs explain the sales and their stress reflects the "compulsion" whereby they acted.

Having concluded that it is a close corporation and that the sales made are not controlling in arriving at the fair market value of the 4,992 shares, it becomes important to consider the evidence with reference to the determination of the actual value of this property. This covers a wide range with prolific detail supplied by Mr. Krinbill, a government expert of impressive ability. The evidence covering the main items tending to show how the government arrived at its valuation of this stock briefly summarized is as follows:

The book value of this stock at the time of Mr. Brooks' death was shown to be $198 a share.

The corporation carried "Accounts Receivable" on its books at $204,386.90; the government reduced it to $150,000.

The corporation carried "Notes Receivable" on its books at $127,300.59. The auditor of the corporation by affidavit stated that as of December 31, 1929, $53,000 of the amount was uncollectible, though testimony was offered by Mr. Foley, plaintiff's witness, that but $32,000 was collectible. The government put it at $55,000.

The corporation carried an item of land on its books of $300,434.42, or $1 an acre. The government in its assessment placed a value of 50 cents an acre. On cross-examination it was shown that the corporation during the years 1926, 1927, and 1928 sold some 90,000 acres of land at $2 an acre.

The books of the corporation carried a valuation for the so-called Staten Island property of $300,000. The Commissioner valued it at $40,000, which was the sale price obtained for it a short time after the death of Mr. Brooks. I do not believe that the fact

that the purchaser of the property later defaulted and that the testimony showed it may come back to the company, affects the valuation at the time of death.

Plaintiff's witness Mr. Foley testified that the average "sound value" of all timber owned by the corporation as of the time of Mr. Brooks' death was $4 a thousand, though he admitted on cross-examination that timber he had valued at $4 per thousand at this hearing had been sold by the company in 1930 and 1931 for a price in excess of $7 per thousand. Mr. Krinbill testified that a similar tract to one owned by the corporation, which he considered one of the best tracts of long leaf pine timber in Florida, had sold in excess of $11 a thousand on January 22, 1930. The government in this connection introduced Department of Agriculture Statistical Bulletin No. 36, Defendant's Exhibit 2, showing stumpage and log prices for 1929 for the character of pine owned by the corporation, to have an average value of $6.68 per thousand, and $9.98 for cypress. Bulletin No. 37 for the year 1930, Defendant's Exhibit 3, for such light as it sheds on the situation, shows an average for southern pine in Florida of $6.34 which includes long leaf pine, and for cypress $5.50. Taking all of these things into account, Mr. Krinbill placed a value of $5.55 a thousand on all the pine timber of the corporation, consisting at that time of approximately 680,000,000 feet.

The corporation, as heretofore indicated, was the owner of approximately 8,800 shares, or a 40 per cent. interest, in the Burton-Swartz Cypress Company. The plaintiff submitted no evidence as to the value of this stock, but admitted that the value of $120 per share placed on it by the Commissioner was fair and reasonable. Defendant's Exhibit 5, an analysis as of December 31, 1929, twenty-one days before Mr. Brooks' death, disclosed a fair value of $136.91 for this stock.

The defendant submitted an analysis which showed that as a result of the move from Eastport to Foley in 1929, all factors being considered such as new items of overhead, certain extra costs of lumber shipments and the like, there was a net advantage to the company of approximately $5.50 per thousand, and this applied to the then stumpage of upwards of 680,000,000 feet of pine timber, represented again by the move of more than $3,500,000.

The stipulation of facts shows a book value of the assets of Brooks-Scanlon Company of almost $8,500,000 which the Commissioner contends represents a fair market value of the net assets of approximately $7,335,000 as of December 31, 1929, or a share value on this latter basis of $191.70, the book value being $198.34.

The evidence was clear that the investigation made for the defendant was careful, complete, and, as indicated, by a man of unquestioned ability and experience. After such investigation and analysis of the assets and properties involved, a figure of $183 per share was arrived at as the fair value of the stock of this corporation as of the time involved herein, and the Commissioner, in making the assessment, further reduced this figure and assessed it on a valuation of $175 per share.

Relying as he does upon the theory that the sales control, plaintiff did not undertake a serious combatting of the items of value and the analysis made by the defendant's exhibits supporting their conclusions.

Without attempting to analyze more in detail the large number of exhibits, I am of the opinion that they amply support the Commissioner's findings. I have read the cases submitted by the plaintiff and I realize the important bearing for which their conclusions are urged, but I cannot escape the conclusion that this was a close corporation and that the sales disclosed in the record, made under the circumstances which accompanied them, do not come within the letter or spirit of the regulation, as contended for by plaintiff. A sale by an individual forced to sell on account of his tottering interests, his loss of income, apparently his largest interest in receivership, the problem of living expenses staring him in the face, and other reasons combining developed largely on cross-examination, does not, in my judgment, establish a value which should be adopted as a fair market value and which can foreclose the Commissioner or a court from attempting to ascertain a true basis of value. Therefore, I believe that the value for estate tax purposes should "be determined upon the basis of the assets underlying the capital stock and the earnings of the corporation." Estate of Fish, 1 B. T. A. 882, and Milton v. Commissioner, 17 B. T. A. 380. The latest case to which my attention has been called possessing applicable bearing is Joseph S. Wells Ass'n v. Helvering, 63 App. D. C. 254, 71 F.(2d) 977, decided May 28, 1934.

It seems to me that under the circumstances disclosed here, the reasoning applied in Newell v. Commissioner (C. C. A.) 66 F.(2d) 102, 103, even though that case was one

where no sales occurred, permits a determination of the earning capacity to ascertain market value "for book value and earning capacity are both important factors in determining market value."

The findings of the Commissioner are prima facie correct and must stand unless overcome by substantial evidence. Phillips v. Commissioner, 283 U. S. 589, 51 S. Ct. 608, 75 L. Ed. 1289; Wells Amusement Co. v. Commissioner (C. C. A.) 70 F.(2d) 208; Old Mission Portland Cement Co. v. Commissioner (C. C. A.) 69 F.(2d) 676; Stiles v. Commissioner (C. C. A.) 69 F.(2d) 951.

I am of the opinion that the Commissioner should be sustained; that the prayer of plaintiff's complaint should be denied and his complaint dismissed; and it is so ordered; to all of which an exception is accorded plaintiff.