THE GEORGE D. HARTER BANK, EXECUTOR OF THE LAST WILL AND TESTAMENT OF DANIEL P. HOOVER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 83745. Promulgated August 30, 1938.

388

*Homer E. Black, Esq.*, and *Albert B. Arbaugh, Esq.*, for the petitioner.

*J. E. Marshall, Esq.*, for the respondent.

### OPINION.

MELLOTT: The petitioner contests a deficiency in estate tax determined by the respondent in the amount of $220,179.09. The questions presented for determination are: (1) What was the value at the time of the death of the decedent of the preferred and class A common stock of the Hoover Co.? (2) Should the value of the corpora of five trusts created by the decedent for the benefit of his wife and four children be included in his gross estate? (3) What was the value at the time of the decedent's death of securities, other than the preferred and class A common stock of the Hoover Co., which should have been included in his gross estate?

Other issues which were raised by the pleadings have been stipulated. The parties now agree that, in addition to the deductions already allowed, the petitioner is entitled to further deductions of $4,040 for executor's fees, $6,000 for attorneys' fees, $5,721.84 for debts, and $7,000 on account of charitable and educational bequests. They also agree that petitioner is entitled to a deduction from the gross estate on account of "property previously taxed" as part of the estate of decedent's father, William H. Hoover, who died in 1932; but the amount of this deduction is dependent upon our decision on the questions in issue. Effect will be given to the stipulations and agreements of the parties upon settlement under Rule 50.

General findings of fact will first be made, after which findings especially applicable to the question to be decided will be made. The questions will be discussed in the order stated.

### GENERAL FINDINGS OF FACT.

Petitioner is the duly appointed, qualified and acting executor of the estate of Daniel P. Hoover, who died testate March 11, 1933. At

the time of his death he was a resident of Canton, Ohio. He was survived by his wife, Clarice Schiltz Hoover, three sons, Joseph Schiltz, Daniel Philip, and Thomas Henry, and a daughter Margaret Ann.

Within the time prescribed by law petitioner filed an estate tax return with the collector of internal revenue at Cleveland, Ohio, reporting a gross estate of $682,559.33. The tax computed to be due in the amount of $24,496.95 was duly paid. The Commissioner determined that the value of the gross estate was $1,749,212.92 and, after crediting the amount of tax paid, that there was a deficiency in tax of $220,179.09.

### I.—Value of the Preferred and Class A Common Stock of the Hoover Co.

FINDINGS OF FACT.

The Hoover Co., a corporation duly organized December 2, 1922, under the laws of the State of Ohio, on December 31, 1922, succeeded the Hoover Suction Sweeper Co. an Ohio corporation organized November 29, 1909. The original paid-in capital of the Hoover Suction Sweeper Co. amounted to approximately $70,000. Between January 1, 1911, and January 1, 1922, preferred stock was issued for cash at $100 per share in the aggregate amount of $884,700, all of which was retired and redeemed at $104 per share on December 31, 1922.

On December 31, 1922, the Hoover Co. acquired the assets and assumed the liabilities of the Hoover Suction Sweeper Co., paying therefor 20,000 shares of its 7 percent preferred stock and 20,000 shares of its common stock, each of the stocks having a par value of $100 per share. On February 6, 1929, the 7 percent preferred stock was changed to 6 percent cumulative preferred, and the new stock was issued to the preferred stockholders on a share for share basis; the 20,000 shares of common stock were changed to 400,000 shares of class A no par common stock, and the new stock was issued to the common stockholders on a basis of 20 shares for one; and a new issue of class B common stock was created and made available for subscription by employees only. By December 31, 1929, 14,738 shares of the class B stock had been sold to employees at $50 per share. Class A and class B common stock participated equally in dividends and in distributions in liquidation.

On March 11, 1933, the total outstanding capital stock of the Hoover Co. consisted of 20,428 shares of 6 percent cumulative preferred, 400,000 shares of class A, and 13,849 shares of class B common stock.

The Hoover Co. is the parent company of a group of wholly owned domestic and foreign subsidiaries. The chief business of each is the manufacture, sale, and servicing of electric suction cleaners, dusting tools, and kindred appliances, and the manufacture and sale of parts therefor. The Hoover Co. is the principal manufacturing company, its plant being located at North Canton, Ohio. The products are manufactured in the United States, Canada, and England, and are sold throughout the United States and in many foreign countries. All of its sales are made through dealers by salesmen who are trained, furnished, and paid by the Hoover Co. or its subsidiary.

Assistance in selling is rendered to the dealers by the Hoover Co. through national magazine advertising, display advertising, radio advertising, and sales promotion campaigns. The company for many years has used the slogan, "It beats as it sweeps as it cleans", as a prominent feature of its advertising matter and sales promotion efforts. Service stations for the maintenance and repair of Hoover cleaners are maintained by the company in principal cities of the United States. The maximum number of such service stations was 153, in 1928, and the minimum number was 89, in 1932. The maximum number of dealers who sold Hoover products was 5,328, in 1929, and the minimum number of dealers was 3,734, in 1935. The maximum number of salesmen employed by the Hoover Co. and by dealers selling Hoover products was 4,670, in 1935, and the minimum number was 2,059, in 1928.

The Hoover Suction Sweeper Co. was the first manufacturer of electric suction sweepers to develop the revolving motor driven brush by which a beating and sweeping action was combined with suction. The mechanical construction which made the use of a revolving brush possible was covered by United States patent numbered 1,147,307, granted July 20, 1915, and by patents in various foreign countries. The United States patent expired July 20, 1932. Following the expiration of this patent, several of the domestic competitors of the Hoover Co. started to use the revolving brush in their cleaners and copied the design of the Hoover machine. On March 11, 1933, the suction sweeper manufactured by the Hoover Co. and sold in the United States was protected by various other patents covering features of design and construction. It maintained a patent department and employed engineers and patent attorneys to develop and obtain patents upon new inventions and improvements in suction sweepers.

The Hoover Co. manufactured and sold various types of cleaners and dusting tools, some of which were sold separately as hand models, or "Dustettes," and some of which were sold as attachments to the standard models. It usually sold three different models, which, during March 1933 were priced at $59.50, $79.50, and $90. In

addition it sold factory rebuilt machines, called "Hoover Specials," and later on it brought out a model which sold for $49.75. Of all Hoover cleaners sold, 40 percent were to "satisfied Hoover users," 35 percent were to users who had previously owned other makes of cleaners, and 25 percent were to people who had never owned a cleaner or had given their old one away. The life of a cleaner varies from five to ten years.

William H. Hoover, founder of the Hoover Co., died in February 1932, and his brother, Frank K. Hoover, died in March 1931. Each had been active in the business of the company until his death. When they died the general policy of the company was not changed in any respect.

The selling method employed by the Hoover Co. at and prior to the death of the decedent was an essentially "high cost method." Salaried employees were maintained in district headquarters, department stores, offices of public utilities, and similar places where "leads" or names and addresses of prospective purchasers were secured. The salesmen, working under a supervisor—five to ten constituting a group—then called upon the prospect and gave a demonstration in the home. Most sales were made as a result of the personal solicitation of a salesman, and sometimes house to house canvasses were made. The salesmen all worked on a commission basis. In 1933 certain towns and cities in the United States began to pass local ordinances requiring licenses and prohibiting door to door solicitation without previous invitations; and although such local ordinances in March 1933 were not a factor in the states in which the Hoover Co. made most of its sales, there was some apprehension that the movement might spread.

Prior to 1933, Hoover cleaners which were sold in Canada, the British Isles, Australia, New Zealand, the European Continent, and South America were manufactured by the Hoover Co., Ltd., a Canadian subsidiary corporation with a manufacturing plant at Hamilton, Ontario. Most of the products manufactured at that plant were sold to Hoover, Ltd., a British subsidiary corporation, for resale in Great Britain and other foreign countries. England went off the gold standard in 1931. About that time there arose in England a sentiment against the purchase of products manufactured elsewhere, known as the "Buy English Movement." In 1932 the Hoover Co. decided that it would be advisable to manufacture cleaners for the British and foreign trade in England. It thereupon began the construction of a manufacturing plant at Perrivale, England, designed to produce 400 cleaners per day. The plant was completed, and manufacturing began in April 1933. It was later increased to a capacity of 800 cleaners a day.

The Hoover Co. abandoned its business in Australia and Germany in the years 1931 and 1932, respectively, because of the enactment of restrictive laws.

The total domestic unit sales of Hoover floor and hand-type cleaners, including rebuilt and reconditioned "Hoover Specials," the total unit sales of all floor and hand-type cleaners in the United States as shown by the published official reports of the United States Department of Commerce, and the percentage thereof represented by Hoover cleaners were as shown in the following table.

| Year | Floor models | | Hand models | |
|---|---|---|---|---|
| | Total U. S. | Hoover | Total U. S. | Hoover |
| | | | *Percent* | | | *Percent* |
| 1923 | 1,016,304 | 227,217 | 22.3 | | |
| 1924 | 903,564 | 210,223 | 23.3 | | |
| 1925 | 1,055,784 | 196,600 | 18.6 | | |
| 1926 | 1,220,100 | 189,874 | 15.5 | | |
| 1927 | 1,228,620 | 217,941 | 17.8 | | |
| 1928 | 1,229,460 | 222,965 | 18.2 | | |
| 1929 | 1,253,112 | 235,544 | 18.8 | 142,548 | 2,938 | 2.1 |
| 1930 | 960,348 | 196,952 | 20.5 | 210,000 | 23,521 | 11.2 |
| 1931 | 687,252 | 170,489 | 24.8 | 191,052 | 34,315 | 18.0 |
| 1932 | 447,060 | 152,617 | 34.2 | 110,232 | 19,273 | 17.5 |
| 1933 | 580,644 | 131,312 | 22.6 | 191,820 | 23,626 | 12.3 |
| 1934 | 737,232 | 154,479 | 21.0 | 246,012 | 22,103 | 9.0 |
| 1935 | 904,152 | 177,361 | 19.6 | 294,444 | 19,602 | 6.7 |

The total net dollar sales of Hoover cleaners to dealers in the United States, the total estimated retail sales of all cleaners in the United States as shown by the published official reports of the United States Department of Commerce, and the percentage thereof represented by Hoover sales, were as shown in the following table.

| Year | Hoover dealer sales in U. S. | Total retail sales in U. S. | Ratio— Hoover to total | Year | Hoover dealer sales in U. S. | Total retail sales in U. S. | Ratio— Hoover to total |
|---|---|---|---|---|---|---|---|
| | | | *Percent* | | | | *Percent* |
| 1926 | $13,634,723 | $65,000,000 | 21.0 | 1932 | $8,997,551 | $19,600,756 | 45.9 |
| 1927 | 15,009,771 | 58,536,086 | 25.6 | 1933 | 7,854,147 | 30,271,330 | 26.0 |
| 1928 | 14,875,405 | 60,973,000 | 24.4 | 1934 | 9,900,785 | 43,555,465 | 22.7 |
| 1929 | 14,152,227 | 64,810,970 | 21.8 | 1935 | 11,420,046 | 54,559,000 | 20.9 |
| 1930 | 12,988,208 | 55,987,704 | 23.2 | 1936 | 13,125,210 | | |
| 1931 | 10,888,800 | 37,310,822 | 29.2 | | | | |

On the books of account and balance sheets of the Hoover Co. subsequent to February 26, 1929, the outstanding preferred stock was carried at $100 per share, the no par class A common stock at $5 per share, and the no par class B common stock at $50 per share. The total net worth of the Hoover Co. as reflected by its books of account, including its stated capital, earned surplus, and reserve for contingencies, but after adjustment to market value of the marketable securities, was as shown in the following table, (1) with respect to the Hoover Co. and its domestic subsidiaries, and (2) with respect to the Hoover Co. consolidated with all of its domestic and foreign subsidiaries.

| Date | Domestic companies | Domestic and foreign consolidated | Date | Domestic companies | Domestic and foreign consolidated |
|------|------|------|------|------|------|
| Dec. 31, 1928 | $9,518,300.83 | $9,608,406.57 | Dec. 31, 1932 | $8,538,589.66 | $9,448,995.58 |
| Dec. 31, 1929 | 8,547,551.94 | 9,127,036.48 | Dec. 31, 1933 | 9,232,711.14 | 10,841,444.68 |
| Dec. 31, 1930 | 8,607,465.44 | 9,376,326.47 | Dec. 31, 1934 | 9,581,320.69 | 11,555,669.21 |
| Dec. 31, 1931 | 8,444,934.21 | 9,346,825.42 | Dec. 31, 1935 | 10,365,427.70 | 13,130,321.47 |

Dividends received by the Hoover Co. from its foreign subsidiaries were as follows:

| Year | Canadian subsidiary | Swiss subsidiary | Year | Canadian subsidiary | Swiss subsidiary |
|------|------|------|------|------|------|
| 1923 | $200,000 | | 1930 | $500,000 | |
| 1924 | 200,000 | | 1931 | 500,000 | |
| 1925 | 375,000 | | 1932 | 750,000 | |
| 1926 | 250,000 | | 1933 | 400,000 | |
| 1927 | 300,000 | | 1934 | 400,000 | $8,103.98 |
| 1928 | 550,000 | | 1935 | 100,000 | 8,172.33 |
| 1929 | 300,000 | | 1936 | | 6,458.00 |

Except as shown above, no dividends have been received from any foreign subsidiaries.

The total net earnings of the Hoover Co. and its domestic subsidiaries, including dividends received from foreign subsidiaries; the dividends paid or accrued on the outstanding preferred stock; the earnings available for common stockholders; and the earnings available per share of common stock for the fifteen-year period from 1922 to 1936, inclusive, were as shown in the following table.

| Year | Total net earnings | Preferred dividends paid or accrued | Earnings on common stock | Earnings per share of common stock |
|------|------|------|------|------|
| 1922 | $1,862,801 | $57,504 | $1,805,297 | [1] $4.51 |
| 1923 | 2,728,736 | 140,000 | 2,588,736 | [1] 6.47 |
| 1924 | 2,287,689 | 140,000 | 2,147,689 | [1] 5.37 |
| 1925 | 2,210,032 | 137,381 | 2,072,651 | [1] 5.18 |
| 1926 | 1,921,581 | 138,209 | 1,783,372 | [1] 4.46 |
| 1927 | 2,583,929 | 138,705 | 2,445,244 | [1] 6.11 |
| 1928 | 2,690,105 | 138,705 | 2,551,400 | [1] 6.38 |
| 1929 | 2,022,664 | 126,629 | 1,896,035 | 4.57 |
| 1930 | 1,089,665 | 123,959 | 965,706 | 2.33 |
| 1931 | 706,118 | 124,033 | 582,085 | 1.41 |
| 1932 | (51,439) | 122,909 | (174,348) | (.42) |
| 1933 | 815,200 | [2] 122,175 | 693,025 | 1.67 |
| 1934 | 791,643 | 121,977 | 669,666 | 1.62 |
| 1935 | 813,437 | 121,905 | 691,532 | 1.07 |
| 1936 | 664,206 | 121,834 | 542,372 | 1.31 |

[1] Computed on 400,000 shares.
[2] Includes $30,520 accrued but not paid until 1934.

The total net earnings of the Hoover Co. consolidated with its domestic and foreign subsidiaries; the dividends paid or accrued on the outstanding preferred stock; the earnings available for common stockholders; and the earnings available per share of common stock

for the eight-year period from 1928 to 1935, inclusive, were as shown in the following table.

| Year | Total consolidated net earnings | Preferred dividends paid or accrued | Earnings on common stock | Earnings per share of common |
|---|---|---|---|---|
| 1928 | $2,835,665 | $138,705 | $2,696,960 | [2] $6.74 |
| 1929 | 2,511,698 | 126,628 | 2,385,070 | 5.75 |
| 1930 | 1,278,608 | 123,959 | 1,154,649 | 2.78 |
| 1931 | 641,514 | 124,033 | 517,481 | 1.25 |
| 1932 | (302,473) | 122,909 | (425,382) | (1.03) |
| 1933 | 1,677,066 | [1] 122,175 | 1,554,891 | 3.78 |
| 1934 | 1,143,677 | 121,977 | 1,021,700 | 2.47 |
| 1935 | 1,857,240 | 121,905 | 1,735,335 | 4.19 |

[1] Includes $30,520 accrued but not paid until 1934.
[2] Computed on 400,000 shares.

The earnings of the Hoover Co. and its domestic subsidiaries for the three-month period ended March 31, 1933, amounted to $254,-379.13, and the earnings of the Hoover Co. and its domestic and foreign subsidiaries for the same period amounted to $82,069.74. These earnings include a profit of $190,000 realized by the Hoover Co. in February 1933 from the sale of certain gas refrigeration patents.

Dividends were paid regularly on the preferred stock at the rate of $7 per annum on the 7 percent preferred stock outstanding prior to the February 1929 recapitalization. Thereafter dividends were paid regularly at the rate of $6 per annum on the 6 percent preferred stock, except for the quarterly payment of $1.50 per share due April 1, 1933, which was postponed and paid in 1934. Cash dividends on the common stock were paid as shown in the following table.

| Year | Common shares outstanding January 1 | Amount of dividend | Actual rate | Equivalent rate on shares outstanding after 1929 reorganization |
|---|---|---|---|---|
| Prior to 1916 | 2,000 | None | None | None |
| 1916 | 2,000 | $20,000.00 | $10.00 | $0.05 |
| 1917 | 2,000 | None | | |
| 1918 | 2,000 | 20,000.00 | 10.00 | .05 |
| 1919 | 2,000 | 40,000.00 | 20.00 | .10 |
| 1920 | 10,000 | 200,000.00 | 20.00 | .50 |
| 1921 | 10,000 | 100,000.00 | 10.00 | .25 |
| 1922 | 10,000 | 125,000.00 | 12.50 | .31¼ |
| 1923 | 20,000 | 600,000.00 | 30.00 | 1.50 |
| 1924 | 20,000 | 1,000,000.00 | 50.00 | 2.50 |
| 1925 | 20,000 | 1,000,000.00 | 50.00 | 2.50 |
| 1926 | 20,000 | 1,000,000.00 | 50.00 | 2.50 |
| 1927 | 20,000 | 2,200,000.00 | 110.00 | 5.50 |
| 1928 | 20,000 | 2,700,000.00 | 135.00 | 6.75 |
| 1929 | 20,000 | 3,640,404.00 | 180.00 | 9.00 |
| 1930 | 414,738 | 934,173.00 | 2.25 | 2.25 |
| 1931 | 415,023 | 207,355.00 | .50 | .50 |
| 1932 | 414,119 | 103,481.00 | .25 | .25 |
| 1933 | 413,849 | 103,527.00 | .25 | .25 |
| 1934 | 414,109 | 310,542.00 | .75 | .75 |
| 1935 | 414,029 | 310,522.00 | .75 | .75 |
| 1936 | 414,029 | 517,536.00 | 1.25 | 1.25 |

By executive decree of the President of the United States, all banks, stock exchanges, and security markets were closed from March 3 to March 15, 1933. There had been a number of banks closed in 1931 in the cities of Canton, Massillon, and Akron in Stark County, Ohio, and additional banks failed to reopen or were reorganized before reopening after the "bank holiday." On October 1, 1931, the Hoover Co. reduced the salaries of its employees by 10 percent and on March 1, 1932, by an additional 15 percent. In March 1933, only 50 percent of the salary rate then in effect was paid. On April 1, 1933, salaries were established at 75 percent of the rates which were in effect prior to March 1933. During the depression, sales resistance increased because of increased competition for the housewife's dollar and direct selling was more difficult. The Hoover Co. attempted to hold up its sales volume by employing more salesmen and by increased expert supervision over its salesmen. As a result there was a substantial increase in the selling cost of each machine sold. The Hoover Co. occupies a prominent position in the vacuum cleaner industry. Its management is good and it is strong financially.

The class A common stock of the Hoover Co. was closely held and was not listed on any exchange, and there were no purchases or sales thereof. The preferred stock was not listed on any exchange and there were no purchases or sales thereof at or near the time of the decedent's death. On April 6, 1933, the Hoover Co. distributed 600 shares of class B common stock to about 50 executives of the company as bonuses and prizes. In the Federal income tax return of the corporation for the year 1933, said distribution was deducted from taxable income as an expense at $20 per share.

On March 11, 1933, the decedent, Daniel P. Hoover, owned directly 791 shares of the preferred stock and 30,750 shares of the class A common stock of the Hoover Co., of which 591 shares of the preferred and 17,750 shares of class A common are identified as "property previously taxed" as part of the estate of William H. Hoover, deceased. Included in the corpora of five trusts established by Daniel P. Hoover were 1,200 shares of preferred stock and 20,000 shares of class A common stock of the Hoover Co.

As of March 11, 1933, the fair market value of the Hoover preferred stock was $83 per share and the fair market value of the class A common stock was $9 per share.

OPINION.

Petitioner, in the estate tax return which was duly filed, reported a value of $50 per share for the preferred stock of the Hoover Co. and $5 per share for the class A common, and included in the gross estate only the shares owned directly by the decedent at the time of

his death. Respondent determined that the preferred had a value of $95 per share, that the class A common had a value of $15 per share, and that the value of the total number of each contained in the corpora of the five trusts established by the decedent should be included in his gross estate. Whether all, or any part of, the stock comprising the corpora of the five trusts should be included in decedent's gross estate will be discussed under issue II. Neither party contends, however, that our decision on that issue will have any effect on the valuation issue being presently considered.

Admittedly there must be included in decedent's gross estate "the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, to the extent of the interest therein of the decedent at the time of his death." (Sec. 302 (a), Revenue Act of 1926.) What, then, was the value of the preferred and class A common stock in the Hoover Co. on March 11, 1933?

We have found as a fact that the value of the preferred was $83 per share and the value of the common was $9 per share. No effort will be made to point out all of the factors which have been considered in arriving at these values, nor will any attempt be made to summarize all of the evidence. Suffice it to say that all of the evidence, whether hereinafter alluded to or not, has been considered. A brief statement of some of the evidence and factors considered, however, may not be amiss.

The generally accepted method of determining "value" for estate tax purposes is to "postulate the existence of a willing seller and a willing and able buyer, both familiar with the situation, reasonable in their views, acting for their own best interests and each willing to make such adjustments in his views upon value as might be necessary to bring about a sale at a reasonable amount, fair to both parties." *Oahu Sugar Co., Ltd.*, 13 B. T. A. 404, 412. Cf. *Adams Express Co.* v. *Ohio*, 166 U. S. 185, 220; *James Couzens*, 11 B. T. A. 1040. The stock of the Hoover Co. has always been closely held and no sales of the preferred or class A common were made on, or near, the date of the death of decedent. The parties, conscious of this fact, have submitted, and we have given due consideration to, a detailed history of the company, its earnings and prospects; its unit and dollar sales year by year in comparison with its competitors; its position in the industry; the nature of its competition; the fact that its basic patent had expired and was being used by others; the probable effect of the maintenance of a capable research department and the development of other patents; its record of dividend payments; its balance sheets and statements of income and expenses; and the general economic conditions, including the fact that the banks and stock exchanges of the

country were closed and it could not then be determined whether the depth of the depression had been reached or not. In addition, we have had the benefit of the testimony of nine witnesses, called by the respective parties as experts upon valuation, whose opinions and methods of valuation differed greatly. It would serve no useful purpose to set out their testimony in detail; but brief reference may be made to some of it.

Witnesses for the respondent stated that in their opinion the fair market value of the Hoover preferred stock as of March 11, 1933, was $95 per share. One of them placed a value of $17.13 per share on the class A common stock, while another testified that in his opinion the value on the basic date was $17.50 per share. Petitioner's witnesses valued the preferred at $32, $50, $55, and $57.50, and the class A common at $5.50, $6, $6.25, and $6.69.

Well qualified witnesses testified for both parties. Their opinions differed, partially at least, because of the methods adopted in arriving at the fair market value. Witnesses for the respondent based their opinions on book value plus an additional sum for good will. In determining the value of $95 per share for the preferred stock one of the witnesses was influenced by the fact that the company had never missed the payment of dividends on its preferred stock, except for the postponement of a quarterly dividend in 1933, and that the stock was callable at $100 plus accrued dividends at any time. The other witness stressed the earnings of the company over the 10-year period prior to 1933. In valuing the class A common stock, one witness determined that the value of the assets and good will behind the preferred and common stock amounted to $9,031,904; that $1,940,-600 should be deducted from this amount to cover the value of the preferred stock at $95 per share; and that the remainder, or $7,091,-304, represented the value of the 414,000 shares of common outstanding. This resulted in establishing a value of $17.13 per share for the class A common. Another witness took the book value of $8,870,127.65 shown on the consolidated balance sheet of the company on December 31, 1932, deducted the value of the preferred stock at $95 per share, and divided the remainder of $6,929,467.65 by the number of shares of common stock outstanding, 414,000, which gave him a value of $16.50 per share. To this he added $1 per share for good will, and thus arrived at a fair market value for the class A common of $17.50 per share. The figures used were taken from the consolidated statements of assets and earnings of the Hoover Co. and its domestic and foreign subsidiaries.

Witnesses for the petitioner arrived at their values by taking into account the assets, earnings, and dividend record of the company and

comparing them with the assets, earnings, and dividend record of other companies. Taking the market prices of the preferred and common stocks of the other companies as a criterion of value, they formed and expressed their opinion as to the value of the Hoover stock. One of them selected companies in the same line of business, another chose companies located in Cleveland or northern Ohio, while others selected corporations seemingly without regard to whether the business in which they were engaged was or was not similar to that of the Hoover Co. We shall not discuss at length the weakness of this type of expert testimony. Some of it is "too speculative to form the basis for the levying and collecting of taxes." *Estate of Jacob Fish*, 1 B. T. A. 882; but while its probative value is small, it has been duly considered.

The valuations returned by the executor were, in our opinion, too low; but those determined by the respondent were too high. Petitioner overemphasizes the effect of the "bank holiday" and the decline in the prices of listed securities. Unlisted stocks, and particularly those of a very closely held corporation, are not subject to many of the factors which cause fluctuations in the prices of listed stocks. Respondent and his witnesses, on the other hand, did not give sufficient weight to the downward trend in the earnings and sales of the company from 1928 to 1932; and, while the petitioner erred in overemphasizing the effect of the general economic conditions, respondent erred in ignoring them entirely. We have weighed all factors; and, although we recognize the fact that valuation of property has not yet become an exact science, we believe that the value we have determined is approximately the amount which a willing seller, not compelled to sell, would accept, and which a willing and able buyer would pay, each being reasonable and entirely familiar with the situation then existing.

The Hoover Co. has always occupied an outstanding position in the vacuum cleaner industry. Its management has been exceptionally good. From an initial investment of approximately $70,000 in 1910, it, by 1933, had accumulated a net worth of over $9,000,000 and has distributed more than $15,000,000 in dividends to its stockholders. It had manufacturing plants in the United States, Canada, and England and its products were sold throughout the United States and in many foreign countries. It sold about 18 percent of the total number of cleaners which were sold annually in the United States, and its dollar volume of retail sales was more than 25 percent of the total United States sales. During the depression years, 1930, 1931, and 1932, its proportion of both unit sales and dollar sales, as compared with its competitors, had been substantially increased. Notwithstanding the

depression, Hoover dealer sales in 1932 declined to only 63 percent of the dealer sales in 1929, whereas the total United States retail sales in 1932 were only 30 percent of those in 1929. The expiration of the Case patent in July of 1932 does not seem to have had any appreciable effect on the volume of sales, although its competitors had begun to manufacture and sell cleaners similar in design to the Hoover cleaner, using the revolving brush in the nozzle.

The total United States sales of all types of cleaners averaged in excess of 1,000,000 per year for the eight years preceding 1933, and there were more than 11,000,000 cleaners in use at the time of the hearing. The life of a cleaner varies from five to ten years, so that in normal times a forecast of replacement sales of $1,000,000 per year would be conservative. In addition the "new customer" field contained many potential buyers. In 1933 there were approximately 21,000,000 houses in the United States wired for electricity. The market for cleaners was, therefore, far from saturated. Judging from its experience in prior years, the Hoover Co. in 1933 could reasonably have expected to participate strongly in both the replacement and new business. In addition to its domestic business the Hoover Co. had a very substantial foreign business, which averaged approximately 50,000 cleaners annually from 1929 to 1933. While net earnings of the company declined from 1928 to 1932, this decrease was chiefly due to two factors, a reduction in the number of cleaners sold and a steady increase in the cost of sales. We have not overlooked the fact that its net sales declined from approximately $15,-000,000 in 1928 to $9,000,000 in 1932 and that it would have sustained an operating loss of $165,708.53 in January and February 1933 if it had not realized a profit of $190,000 in February from the sale of certain gas refrigeration patents. Nor do we ignore, or unduly minimize, the general economic conditions. The outlook was, as argued by petitioner, "quite gloomy"; but it was not, in our opinion, quite as bad as petitioner now paints it.

We have set forth in our findings tabulations showing the earnings of the Hoover Co., its net worth, and dividends paid on its preferred and common stock prior to March 11, 1933. It would serve no useful purpose to discuss at length the various implications which might be drawn from these figures. They tend to support the contentions made by both parties. We have carefully considered and weighed all of this evidence in the light of conditions as they existed on March 11, 1933, and believe, as stated above, that it, together with all of the other evidence and factors, justifies the conclusion we have reached that the value of the preferred, on March 11, 1933, was $83 per share and the value of the class A common was $9 per share.

## II.—*Inclusion in Gross Estate of Corpora of Trusts.*

### FINDINGS OF FACT.

On November 12, 1925, the decedent executed four separate declarations of trust for the benefit of his wife and three children, one being the beneficiary in each trust. On April 26, 1929, he executed a declaration of trust for his youngest child. The terms and conditions of the trust instruments were substantially identical. Personal property and various securities were transferred to the George D. Harter Bank of Canton, Ohio, as trustee. The entire net income from the trust for the benefit of the wife was to be paid to her from time to time as requested, and upon her death the entire trust then remaining was to pass, in equal shares, to the other three trusts first created for the benefit of his children. In each of the children's trusts, the entire net income was to "accumulate and be invested and reinvested" until the child named therein as beneficiary should attain the age of 21 years, when the entire net income should then become payable to the child. Distributions of principal were to be made when the child attained the ages of 25, 30, and 35, at which last mentioned age the trust was to terminate. During minority so much of the income was to be expended by the trustee for the support and education of the beneficiary as was directed by the trustor during his lifetime or by his wife or any guardian of the minor after the trustor's death. Each trust contained a reservation in the trustor to vote or direct the voting of the shares of stock during his lifetime, and provided:

The trust hereby created is and shall be irrevocable during and throughout the remainder of the calendar year 1925, and shall likewise be irrevocable during and throughout each calendar year thereafter, unless between the 1st and 31st days of December of the year 1925 or of any subsequent year, the same shall, by the Trustor, by written notice to the Trustee, be revoked, such revocation to be effective on and after but not prior to the 1st day of January next succeeding, or unless said Trustor shall between said 1st and 31st days of any year, by like written notice revoke, alter or modify this trust or any of the terms hereof for the next succeeding and/or any subsequent calendar year or years; the right to effect such revocation, alteration or modification of this trust or any of the terms hereof, in the manner and subject to the conditions aforesaid, being hereby reserved to the Trustor, to be exercised without any consent of the Trustee or of any beneficiary or beneficiaries hereof; but whenever any calendar year shall have commenced without any such notice of revocation, alteration or modification having been given as aforesaid, this trust and all of its terms and provisions shall be and continue irrevocably in force throughout the calendar year so commenced. To whatever extent this declaration of trust, and the trust hereby created, shall be so revoked, altered or modified, the Trustee shall thereupon transfer, deliver or convey to the Trustor such part or all of the trust property then in the hands or under the control of the Trustee as may have been withdrawn from the trust by such revocation, alteration or modification, subject, however, to the payment

by the Trustor of all expenses and charges of the Trustee and the repayment of all advances or loans made or procured by the Trustee, and upon the satisfactory indemnification of the Trustee against any liability by it incurred in the execution of this trust.

On December 27, 1929, the trustor signed and delivered to the trustee instruments modifying each of the trusts by declaring that on and after January 1930 the clause set out, *supra*, should be null and void and substituting in lieu thereof two clauses, reading as follows:

(A) This Trust is and shall be irrevocable and shall continue in force until all the purposes expressed in the Declaration of Trust shall have been accomplished; provided, that if the Trustor shall be living on the 1st day of January, 1933, then this Trust shall terminate upon said date and all the principal of this Trust Estate then in the hands of said Trustee shall be delivered and/or paid to and become the property of the Trustor.

(B) If this Trust terminates as provided in Subdivision (A) above, then any accumulated income, even though invested, shall be paid, transferred and delivered in equal shares or proportions to the four trusts which I have created for my four children, Joseph Schiltz Hoover, Margaret Ann Hoover, Thomas Henry Hoover and Daniel Philip Hoover.

The modification of the trust for the benefit of the wife, in addition to (A) and (B), *supra*, contained the following clause:

Inasmuch as Daniel Philip Hoover, another son of the Trustor, has been born since the making of said Declaration of Trust, and the Trustor desires to make provision for said son equally with his other children named in said Declaration, Clause 2 of the provisions of said Declaration concerning disposal of the Trust Estate, which Clause 2 provides for transfer of shares out of the Clarice Schiltz Hoover Trust to trusts in favor of children of the Trustor, is hereby amended as follows:

At the death of Clarice Schiltz Hoover, the Trust Estate shall be divided into four equal shares instead of three such shares, and one of said shares shall be paid over and transferred to the trust, designated as the "Daniel Philip Hoover Trust", created by a Declaration of Trust dated April 26, 1929, of which the Trustee herein is Trustee, and shall become a part of the principal of said trust in the same manner and upon the same terms as the Declaration of Trust hereby amended provides concerning trusts for the Trustor's other three children. The remaining three shares shall be made over to the trusts of the Trustor's other children in the same manner and upon the same terms as are now provided by the Declaration.

Said Declaration of Trust is hereby reaffirmed in each and every other respect.

On December 27, 1929, the decedent created four income trusts, one for the benefit of each child, to receive the net income and capital gain from such child's principal trust and to hold and invest the same until the child should arrive at 21 years of age, when the income was thereafter payable to the child until the child became 25 years of age, at which time the trust was to be terminated and the principal distributed to such child, with the further provision that while

the child was a minor such parts of the principal and income of the trust could be used for its support and maintenance as the decedent's wife or any guardian of the child should designate. These four income trusts contained no provision for revocation. No part of the income or principal of the five principal trusts or of the four income trusts was at any time delivered to the beneficiaries of said trusts, or used or expended for the maintenance, support, or education of any of the four children, prior to the death of the decedent on March 11, 1933.

On May 26, 1932, the decedent executed and served upon the trustee of each principal trust, a notice of intention to continue each trust "irrevocably in force until all the purposes expressed in the declaration of trust shall have been accomplished", with the further proviso that if the trustor should be living on the first day of January, 1938, then the trust should terminate, "and all the principal * * * shall be delivered and/or paid to and become the property of the Trustor." This instrument also conveyed to the trustee all of the trustor's right, title, and interest in the existing trust property and directed that any accumulated income be paid over to the companion income trust.

Respondent included the assets of the five principal trusts in the gross estate of the decedent.

### OPINION.

The respondent states his "basic position" to be that each of the five trusts was intended to take effect in possession or enjoyment at or after the decedent's death, and that the property contained therein was therefore taxable under section 302 (c) of the Revenue Act of 1926. This is the only contention urged by him in his brief. The parties have stipulated "that none of said trusts or the modifications or extensions thereof was made by the decedent in contemplation of death within the meaning of section 302 (c) of the Revenue Act of 1926."

In the statement attached to the deficiency notice the respondent stated, as some of the grounds for including the value of the trust property in the decedent's estate, that: (1) The property was owned by the decedent at the date of his death and under the provisions of section 302 (a) of the Revenue Act of 1926 should have been included in his gross estate; (2) the value of the trust property should have been included in the gross estate under the provisions of section 302 (d) as property the enjoyment of which was subject at the date of death to a change through the exercise of a power to alter, amend or revoke; and (3) under the amendment to section 302 (c) of the Revenue Act of 1926, contained in the joint resolu-

tion of March 3, 1931, the value of the trust property was includable in the gross estate.

The pertinent provisions of section 302 of the Revenue Act of 1926 [1] and the Joint Resolution of March 3, 1931,[2] are set forth in the margin. Petitioner alleged in its petition that respondent erred in including, as part of the gross estate of the decedent, the property constituting the corpora of the trusts created by the decedent for the benefit of his wife and children. The petitioner's allegation of error, which was denied by respondent, is sufficiently broad to cover all of the grounds stated by the respondent for including the value of the corpora of the trusts in the decedent's gross estate. While it might be inferred from the respondent's brief that the sole ground upon which he now relies is that the trusts were intended to take effect in possession or enjoyment at or after the decedent's death, in the absence of any definite statement that the other grounds have been abandoned, we feel that they should not be ignored. We shall therefore discuss them briefly before taking up respondent's basic contention.

In our opinion there is no justification for including the value of the trust property in the gross estate of the decedent under the provisions of section 302 (a), *supra*. The decedent did not own the trust property at the time of his death, all of his right, title and interest therein having been conveyed to the trustee. The possibility that title to the trust property might have reverted to him if he had lived until January 1, 1938, will be discussed later. Nor do we think that the property should be included in his gross estate under section 302 (d), *supra*. This section provides that the property may be included

---

[1] Sec. 302. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

(a) To the extent of the interest therein of the decedent at the time of his death;

    \*        \*        \*        \*        \*        \*        \*

(c) To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, except in case of a bona fide sale for an adequate and full consideration in money or money's worth. \* \* \*

    \*        \*        \*        \*        \*        \*        \*

(d) To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power, either by the decedent alone or in conjunction with any person, to alter, amend, or revoke, or where the decedent relinquished any such power in contemplation of his death, except in case of a bona fide sale for an adequate and full consideration in money or money's worth. \* \* \*

[2] *Resolved*, \* \* \* That the first sentence of subdivision (c) of section 302 of the Revenue Act of 1926 is amended to read as follows:

(c) To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, including a transfer under which the transferor has retained for his life or any period not ending before his death (1) the possession or enjoyment of, or the income from, the property or (2) the right to designate the persons who shall possess or enjoy the property or the income therefrom; except in case of a bona fide sale for the adequate and full consideration in money or money's worth.

"where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power, either by the decedent alone or in conjunction with any person, to alter, amend or revoke" the trusts. The only provision which possibly could be considered as "a power to alter, amend or revoke" is the provision in the decedent's notice of intention to continue in force, executed in May 1932, wherein it is provided, in substance, that if he be living on January 1, 1938, then the trust should terminate. This provision, in our opinion, is not a power to alter, amend or revoke, nor is it equivalent thereto. *Helvering* v. *Helmholz*, 296 U. S. 93. All that the decedent had at the time of his death was the mere possibility that the trust property would revert to him on January 1, 1938, if he were then alive. This was a contingency over which he had no control. *Helvering* v. *St. Louis Union Trust Co.*, 296 U. S. 39.

The Joint Resolution of March 3, 1931, amended section 302 (c) of the Revenue Act of 1926 by adding thereto a provision for including in the gross estate of the decedent any interest of which he had, at any time, made a transfer, by trust or otherwise, under which he retained for his life, or for any period not ascertainable without reference to his death, or for any period which does not end before his death, (1) the possession or enjoyment of, or the right to the income from, the property; or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom. The income from the trusts now under consideration irrevocably passed to the irrevocable income trusts, in which the decedent had no title or interest and over which he could exercise no control. Moreover he retained no right at the time of his death, either alone or in conjunction with any other person, to designate who should possess or enjoy the trust property or its income. We see no merit in respondent's contention that the property is includable in decedent's gross estate under this section.

The remaining and "basic" contention of the respondent is yet to be considered. He says: "Each of these trusts was intended to take effect in possession or enjoyment at or after the decedent's death and are therefore taxable under Section 302 (c) of the Revenue Act of 1926." He argues that under the rule enunciated and applied by the Supreme Court in *Burnet* v. *Guggenheim*, 288 U. S. 280, no completed gift of the property had been made by the decedent during his lifetime; that the trusts were for a fixed period, with a full remainder "vested" in the decedent; that only his death prior to January 1, 1938, would divest him of that interest; that the phrase "to take effect in possession at or after his death" includes such an interest as the decedent retained in the trust property, citing *Reinecke* v. *Northern Trust Co.*, 278 U. S. 339; that there was a "shifting of the

economic benefits and burdens of property" (*Saltonstall* v. *Saltonstall*, 276 U. S. 260) by his death; and that his death was the "indispensable and intended event which brought the larger estate into being for the grantee" (*Klein* v. *United States*, 283 U. S. 231).

Petitioner contends that full title to the trust assets was passed by the trust instruments to the trustee in trust for the beneficiaries; that the trusts were to continue irrevocably in force until all the purposes expressed in the declarations were accomplished; that the trust created for the benefit of the wife was to continue during her natural life and upon her death the trust estate was to be divided into equal shares to be paid over to the trusts created by the decedent for his children; that the trusts for the children were to continue until each should reach the age of 35 years, when they should terminate, with partial distributions of principal at the ages of 25 and 30 years; that all the decedent had was a reversionary interest in the trust assets, subject to the condition precedent that he should be alive on January 1, 1938; and that his death merely cut off the possibility of the property reverting to him and did not result in any enlargement of the interests of the beneficiaries.

It is well settled that, if a decedent has "a mere possibility of a reverter", the value of the property in which only such interest exists is not includable in his gross estate. The reason is obvious. Cf. *Becker* v. *St. Louis Union Trust Co.*, 296 U. S. 48; *Helvering* v. *St. Louis Union Trust Co.*, 296 U. S. 39; *Mary Q. Hallock et al., Trustees*, 34 B. T. A. 575 (on appeal C. C. A., 6th Cir.) ; *Estate of Waldo C. Bryant*, 36 B. T. A. 669 (on appeal C. C. A., 2d Cir.) ; and *Florence Scofield Stone et al., Executrices*, 38 B. T. A. 51. The death of one having such an interest merely extinguishes the possibility—converts it into an impossibility; but it can not be said to be the "generating source" of passing title to, or enlarging an interest in, property. If, however, under a trust instrument, the decedent has or retains a vested remainder interest in the trust assets which passes to another at his death, the passing of that interest comes squarely under section 302 (a) or 302 (c) and its value must be included in his gross estate. *Klein* v. *United States, supra; Sargent* v. *White*, 50 Fed. (2d) 410; *Chemical Bank & Trust Co. et al., Executors*, 25 B. T. A. 1153 (on appeal, C. C. A., 2d Cir.) ; and *W. H. Holderness, Administrator*, 33 B. T. A. 155; affd., 86 Fed. (2d) 137.

*Burnet* v. *Guggenheim, supra*, dealt with a trust in which the donor specifically reserved a power of revocation. It was held that no completed gift was made when the trust was created but that one was made when the deed became absolute through the cancellation of the power. But here the decedent retained no power of revocation after the modification of the trusts. The substituted clauses,

incorporated in the trusts December 27, 1929, specifically provided that each should be "irrevocable and * * * continue in force until all the purposes * * * shall have been accomplished." This was followed by a proviso that the trust should terminate on January 1, 1933, if the grantor were then living. Before that time arrived the grantor executed other instruments, continuing each trust "irrevocably in force until all the purposes * * * shall have been accomplished", and providing that if he should be living on January 1, 1938, the trust should terminate and the principal should "be delivered and paid to and become" his property.

Respondent apparently takes the position that the decedent conveyed only an estate for years in the trust property, which was to terminate on January 1, 1938, and that the decedent retained a vested remainder interest which was subject to be divested if he died prior to that date; but we can not accept this view. In our opinion the decedent made a conveyance to the trustee of all his interest in the trust property. In the event of his death prior to January 1, 1938, no other act was required to vest the title to such property in the trustee or to continue the trust in full force and effect. On the other hand, it required an affirmative act of the trustee to revest the title to the property in the grantor. This was to be done only in the event he lived until January 1, 1938.

In the law of real property, such a conveyance as we are now considering creates what is commonly designated a determinable or qualified fee, or fee simple determinable. "An estate in fee simple determinable is created by any limitation which, in an otherwise effective conveyance of land (a) creates an estate in fee simple; and (b) provides that the estate shall automatically expire upon the occurrence of a stated event." Restatement of the Law of Property, vol. 1, p. 121. "The word 'remainder' does not include a future interest which becomes a present interest, if ever, upon the expiration of an estate in fee simple determinable, *or of an analogous interest in a thing other than land,* or of an estate in fee simple conditional." (Italics ours.) Restatement of Law of Property, vol. 2, p. 535. The possibility of again having the fee, which exists in a grantor after the grant of a fee simple determinable, and the possibility of again acquiring the title to personal property, which exists where an individual has parted with an analogous interest in personalty, is known as a possibility of reverter. 21 C. J. 1017.

We think it is quite doubtful that the interest which the decedent had in the trust property can properly be characterized as a "remainder." All that he had was a possibility that the property might revert to him in the event that he should be alive on January 1, 1938. His interest was more in the nature of a future interest, to come into

being only in the event of the happening of an event over which he had no control. Like the grantor in *Helvering* v. *St. Louis Trust Co.*, *supra*, he, "by the trust instrument, left in himself no power to resume ownership, possession, or enjoyment, except upon a contingency in the nature of a condition subsequent, the occurrence of which was entirely fortuitous so far as any control, design, or volition on his part was concerned."

The respondent erred in including in decedent's gross estate the value of the property comprising the corpora of the trusts created by him for the benefit of his wife and children.

### III.—*Value of Securities Other Than the Hoover Co. Stock.*

#### FINDINGS OF FACT AND OPINION.

The petitioner and respondent have submitted for our consideration six lists of securities. One is labeled "Estate of Daniel P. Hoover, Securities in Estate." The others list securities which formed part of the corpora of the five trusts discussed under issue II. In each list is shown the mean selling price, or mean bid and asked price, of each security on March 3, 1933, and on March 15, 1933, according to the quotations on the New York Stock Exchange, New York Curb Exchange, or other recognized markets for such securities. There is no record of any trading in such securities in any of the markets between the end of March 3, 1933, and the beginning of March 15, 1933.

The issue is the fair market value, as of March 11, 1933, of the securities properly includable in the gross estate of the decedent. Having decided that the value of the securities which formed the corpora of the five trusts should not be included in the gross estate, it would serve no useful purpose to decide what their fair market value was as of March 11, 1933. Our decision is therefore directed only to the securities contained in the list labeled "Estate of Daniel P. Hoover, Securities in Estate."

Article 10 of Regulations 80, relating to estate tax, provides as follows:

If there were no sales on the valuation date, the value shall be determined by taking the mean between the highest and lowest sales upon the next date either before or after the valuation date if within a reasonable period thereof.

Respondent determined that the market quotations on March 15, 1933, were more nearly representative of the fair market value of the securities as of March 11, 1933, than were the quotations on March 3, 1933. Petitioner contends that the quotations on March 3, 1933, should be used. The March 15 quotations were higher than those of March 3.

Two witnesses testified that in their opinion the March 3, 1933, quotations more clearly reflected the value of the securities on March 11, 1933, than did the quotations of March 15. One witness testified that the quoted prices on American stocks contained in the London papers showed no perceptible change from March 3 to March 11. The other testified that nothing happened between March 4 and March 11 that would have encouraged anyone to make an investment in stock or securities, and that the first encouragement occurred on March 12, when the President made his first "fire-side" talk to the public. Respondent relies upon the prima facie correctness of his determination, upon certain articles contained in the Wall Street Journal of March 11, 1933, and upon an editorial from the March 13, 1933, issue of the same paper which, he says, indicates that the events which caused the increase in the market quotations on March 15, 1933, over those of March 3, 1933, occurred during, and not after, the week ended March 11, 1933.

We have given careful consideration to all of the evidence and the arguments and suggestions of counsel. We are of the opinion, and find as a fact, that the quotations of March 3, 1933, more nearly reflect the fair market value of the securities owned by the decedent at the time of his death than do those of March 15, 1933.

*Judgment will be entered under Rule 50.*