CHARLES W. BALLARD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 36479.   Promulgated February 24, 1932.

*Milton Rindler, C. P. A.*, for the petitioner.
*O. J. Tall, Esq.*, for the respondent.

OPINION.

Murdock: The petitioner contends that he sold his interest in the partnership of D. S. Walton & Company in 1924 and thereby suffered a loss. In his return he took a deduction of $24,375 representing this loss. In the petition he claims that the loss amounted to $28,417.10, while in his brief he computes the loss at $37,530.70. In his computations the amount of the loss depends upon the March 1, 1913, value of his share of the intangible assets of the firm. The Commissioner not only denied the loss, but he also denied that the sale occurred in 1924. The parties have stipulated that the petitioner on March 1, 1913, had in the firm then existing a cash investment of $40,000, representing a one-eighth interest, and that such interest in the tangible assets had a fair market value at that date of $40,000. The petitioner has sought to prove in addition that his one-eighth interest had a fair market value on March 1, 1913, in excess of $40,000.

The partnership which existed on March 1, 1913, was not the same partnership that existed in 1924 and up to noon of January 1, 1925. Several partnership agreements had been entered into in the meantime. The business carried on by these various partnerships had remained much the same. There might be some question as to whether the March 1, 1913, value has any bearing upon the present question of the gain or loss from the sale in 1924 or 1925, although it is possible that the petitioner, after March 1, 1913, made a number of nontaxable exchanges so that the fair market value of what he owned

on March 1, 1913, is the basis for gain or loss upon the sale of what he had at the end of 1924. The petitioner contends that the value of the good will and other intangible assets on March 1, 1913, had dwindled to nothing and disappeared by the time the petitioner sold his interest in the firm. If this were true it might raise some other questions. Since, however, we can not determine the basis, it becomes unnecessary to decide any other question, including the question of when the sale took place. We are satisfied, however, that the sale did not take place in 1924. *Lucas* v. *North Texas Lumber Co.*, 281 U. S. 11; *American Bank & Trust Co., Executor*, 14 B. T. A. 615; affd. *sub nom. American Land & Investment Co.*, 40 Fed. (2d) 336; Williston on Sales, 2d ed., vol. 1, p. 1. Cf. *Charles W. Dahlinger*, 20 B. T. A. 176; affd., 51˙ Fed. (2d) 662; *Commissioner* v. *Swift*, 54 Fed. (2d) 746. The petitioner has not sought any relief in case we find that the sale took place in 1925.

The petitioner was the only witness. He gave his opinion as to the fair market value on March 1, 1913, of the intangible assets of the firm which existed on that date. But the basis for his opinion and the method of reasoning used by him in arriving at this opinion were such as to cause his own counsel to admit that his opinion was worthless and should be ignored. We agree that his opinion should be disregarded. *Uncasville Mfg. Co.* v. *Commissioner*, 55 Fed. (2d) 893. He testified, however, as to certain facts and other facts were stipulated. His counsel argues that the only method available for the computation of the fair market value of the good will of the partnership on March 1, 1913, is by use of a formula described as the third method in A. R. M. 34, C. B. No. 2, p. 31. This memorandum discloses that the Committee found itself unable to lay down any general rule for the determination of the fair market value of intangibles. It only suggested the method as one which might be utilized broadly to check upon the soundness and validity of a taxpayer's claims. To apply the formula, average earnings for a period prior to March 1, 1913, preferably not less than five years, were required. Abnormal years should be eliminated. There were variables in the formula suggested which depended upon circumstances. The memorandum concluded as follows:

In any or all of the cases the effort should be to determine what net earnings a purchaser of a business on March 1, 1913, might reasonably have expected to receive from it, and therefore a representative period should be used for average actual earnings, eliminating any year in which there were extraordinary factors affecting earnings either way. Also, in the case of the sale of good will of a going business the percentage rate of capitalization of earnings applicable to good will shown by the amount actually paid for the business should be used as a check against the determination of good will value as of March 1, 1913,

and if the good will is sold upon the basis of capitalization of earnings less than the figure above indicated as the ones ordinarily to be adopted, the same percentage should be used in figuring value as of March 1, 1913.

It will be noted at the outset that all of the sales of interests in the partnerships in this case of which we have any knowledge were made at book value, which included nothing for intangibles. Earnings for a period of only three years and eight months prior to March 1, 1913, have been shown. In this short period the earnings fluctuated greatly, but we have not been told whether or not the period included any abnormal year. Furthermore, our knowledge of the risks of the business is not sufficient to enable us to determine intelligently the percentages to be used in applying the formula. Cf. *Grant Trust & Savings Co., Trustee*, 3 B. T. A. 1026; *Portage Silica Co.*, 11 B. T. A. 700; affd., 49 Fed. (2d) 985; certiorari denied, 284 U. S. 667. If we were to use the formula we would not know what part of the average earnings to attribute to the tangibles or what additional part, if any, to attribute to good management, location, firm name, and the presence and activity of the partners themselves in the business. Fair market value has been defined as the price likely to be agreed upon by a willing buyer and a willing seller, neither forced to buy or sell, but both having knowledge of the facts. Had the petitioner sold his interest on March 1, 1913, his connection with the business would have ceased together with any benefit which the business had theretofore derived from such connection. We do not know that the amount designated " salary " was a proper measure of his value to the business of the firm. The partnership agreement in effect on March 1, 1913, was to remain in effect only until noon of January 1, 1915. A purchaser of the petitioner's interest on March 1, 1913, would not only have taken into consideration this circumstance, but also the fact that the partnership would have been dissolved immediately by the petitioner's withdrawal from the firm. The location of the business, the name of H. S. Walton, and the benefit of Walton's association with the firm might all have been lost to a prospective purchaser on March 1, 1913. We do not know how valuable to the firm was the location at which it transacted its business or the name under which it transacted its business, but the location and the name gave little value to the petitioner's interest on March 1, 1913, since Walton could have used both after the partnership then existing was dissolved. We do not know how valuable Walton was to the firm, but if any part of the earnings over and above the normal return on tangibles was attributable to Walton, such value would have to be discounted in determining the fair market value of the petitioner's interest on March 1, 1913. Cf. *Providence Mill Supply Co.*, 2 B. T. A. 791. A purchaser of the petitioner's

interest on March 1, 1913, would have realized that he could gain nothing from any intangible asset such as good will unless he should be permitted to share in some way in a continuation of the going business. He would know also that in a partnership there is *delectus personae*. Thus, the value of the intangibles, in his opinion, would have depended to a very large extent upon the willingness or unwillingness of the other partners to accept him as a member of the new firm to carry on the business. This feature of a partnership makes any valuation extremely difficult. Walton and the petitioner had been associated with the business for many years prior to March 1, 1913; the firm enjoyed a good reputation in the trade; and the average earnings for the period of three years and eight months prior to March 1, 1913, probably exceeded a normal return on the tangible assets of the firm. Nevertheless, we are unable to determine from the facts in the record that the petitioner's one-eighth interest in the partnership had a value on March 1, 1913, in excess of $40,000. That is, we can not translate any excess earnings of the firm into value of the petitioner's interest.

The petitioner contends that the firm also had valuable contracts on March 1, 1913, particularly one with the Union Bag & Paper Company. He was quite vague as to the date, duration, and terms of the contract with the Union Bag & Paper Company in effect on March 1, 1913, but it seems to have been for a short term. So far as we can see it was entered into at arm's length and we can not find any justification for concluding that it gave the partnership any more than fair compensation for services rendered. The petitioner claimed that neither his original acquisition of a partnership interest nor his final disposition of his partnership interest was an arm's-length transaction which would indicate the fair market value of the subject matter. He stated that he acquired his interest at a very low price because Walton was anxious to have him continue in the business, and he sold out at a very low price because of ill health. It appears, however, that the petitioner's brother acquired his interest at the same time the petitioner acquired his and that the brother sold at the same time the petitioner sold, but there is no reason to believe that Walton made any reduction in price in order to get the brother to come into the firm. The brother did not sell his interest because of ill health. The books never reflected any value for intangibles and, as we have heretofore pointed out, each of the sales of interests in the partnerships was made at book value. We are unable to say that the basis for gain or loss from the sale of the petitioner's interest was any larger than the amount determined by the Commissioner. The latter made an alternative contention in case we disturbed his determination as to either year. Since we do not disturb his deter-

mination as to either year, we need not discuss this alternative contention.

*Judgment will be entered for the respondent.*