**RHEINSTROM v. WILLCUTS et al.**
No. 3830.

District Court, D. Minnesota,
Fourth Division.

Dec. 27, 1938.

Arnold L. Guesmer, of Minneapolis, Minn., for plaintiff.

J. E. Garvey, Sp. Asst. to Atty. Gen., and Victor E. Anderson, U. S. Atty., and Linus J. Hammond, Asst. U. S. Atty., both of St. Paul, Minn., for defendants.

JOYCE, District Judge.

This case was submitted on a stipulation of facts and oral testimony taken in open court. From the stipulation of facts it appears that on and prior to March 1, 1913, there were outstanding and issued 400 shares of common stock of the Cream of Wheat Company of the par value of $100 per share. There was no other outstanding stock of the company, nor were there bonds or mortgages against the property. The plaintiff herein owned four shares of stock. In 1929, in a non-taxable reorganization, the Cream of Wheat stockholders received 600,000 shares of no-par value stock in place of the 400 shares above mentioned. In lieu of the four shares theretofore owned, the plaintiff received 6,000 of the new shares as a result of the reorganization. On March 1, 1913, the Cream of Wheat Company was a closely held, unlisted stock. The record discloses no sales thereof prior to that date. In the month of June, 1929, some time before the 14th of the month, plaintiff sold 1380 of her 6000 shares for the sum of $51,004.80. In her tax return filed March 15, 1930, plaintiff showed a profit of $16,504.80 on the sale of the 1380 shares, arrived at as the difference between the sale price of $51,004.80 and a value of the stock claimed as of March 1, 1913, of $34,500. The Commissioner of Internal Revenue determined that the March 1, 1913, value of this stock was $15,636.53 per share (which value was reduced to $10.424353 per share by the 1500 to 1 split up in 1929), making a net profit on the sale of said shares of $36,619.19 instead of the amount claimed by plaintiff, and that there was a deficiency tax due in the amount of $2966.76, together with interest amounting to $466.67, or a total of $3433.43, which plaintiff paid to avoid a penalty and thereafter filed a claim for refund, which in turn was denied and disallowed. This action seeks recovery of the amount so paid.

The essence of the dispute is the question, what was the fair market value of Cream of Wheat stock on March 1, 1913? The statute involved reads as follows:

Section 113(b), Revenue Act of 1928, c. 852, 45 Stat. 791, 821, 26 U.S.C.A. § 113 note. "(b) Property Acquired before March 1, 1913.—The basis for determining the gain or loss from the sale or other disposition of property acquired before March 1, 1913, shall be:

"(1) the cost of such property * *, or

"(2) the fair market value of such property as of March 1, 1913, whichever is greater. In determining the fair market value of stock in a corporation as of March 1, 1913, due regard shall be given to the fair market value of the assets of the corporation as of that date."

It must be determined whether plaintiff has established by a fair preponderance of the evidence that the March 1, 1913, fair market value of the stock involved was an amount in excess of the value determined by the Commissioner.

The Cream of Wheat Company commenced operations in Grand Forks, North Dakota, about 1898, in the manufacture of a breakfast food made from a wheat product supplied the company by various flour mills. The company moved to Minneapolis where manufacture was successfully continued and its product enjoyed an extensive market both at home and abroad. It operated on a small capital with small tangibles and small inventories. It possessed excellent management and produced tremendous returns on the amount invested, as shown for the five or six year period immediately preceding March 1, 1913. It sold its product, consisting of 36

twenty-eight ounce packages to the case, at $4.12 per case. Its price was never varied during the period in question. Prior to the advent of the so-called package breakfast foods, the then used products were largely sold in bulk and at the time in question, so far as the record discloses, the principal companies engaged in the production of breakfast food products were the Quaker Oats, Shredded Wheat Biscuit and the Cream of Wheat Companies. The Quaker Oats and the Shredded Wheat Companies were listed stock, both having common and preferred widely dealt in.

The testimony on behalf of the plaintiff, aside from the exhibits and what appears in the statement of facts, was supplied by three witnesses. Mr. Sidney R. Mather, who became associated with the company in 1902 and left them in 1919, was an accountant and office manager and ran the business in the absence of Mr. Mapes and Mr. Clifford, the dominating figures in the company, neither of whom was called as witnesses. From this witness's testimony it appears that the factory employed from 250 to 300 persons and from 25 to 40, depending upon conditions, were employed in the office. He testified further that on March 1, 1913, the business was systematized and that it was not difficult for him to manage it in the absence of Mr. Mapes and Mr. Clifford, who would be away from two to three months each at a time. That it was without a traffic manager other than himself and that Mr. Mapes looked after the advertising. There was but one factory. This witness did not assume to express an opinion as to value of the stock at any time and other than as to the character and manner of operation his testimony is not enlightening on the question of value.

The plaintiff relies largely upon the disclosures contained in Exhibits A, B and C attached to the stipulation of facts. Exhibit A is designated "Balance Sheet, Tangibles Only"; Exhibit B, "Earnings Statements 1908 to 1913, inclusive"; and Exhibit C is to be considered in connection with the other two exhibits. It sets forth the dividends paid from 1908 to 1912, inclusive, and the two months of January and February, 1913. It also shows the advertising expense over the period and the growth in the sale of cases from 515,972 in 1908 to 640,854 at the end of 1912. Like information is supplied for the two month period of January and February,

1913. It also discloses the wage cost in 1908 to have been $95,079.19 for the factory and $14,451.94 for the office, and for 1912 for the factory $123,731.73 and for the office $17,135.05. It paid dividends in 1908 of $400,000; in 1909 of $460,000; in 1910 of $520,000; in 1911 of $640,000, and in 1912 of $540,000. In January 1913 it paid $40,000 and in February 1913 $80,000.

The company had net income for the years 1908 to February 28, 1913, both inclusive as follows:

| | |
|---|---|
| 1908 | $396,847.78 |
| 1909 | 440,870.89 |
| 1910 | 524,768.94 |
| 1911 | 626,731.39 |
| 1912 | 612,574.43 |
| January and February 1913 | 109,362.14 |

From January 1, 1908, to February 28, 1913, the net tangible assets of the company averaged $635,000, approximately.

The other two witnesses for the plaintiff, Mr. Justus F. Lowe, who is an investment banker of twenty-five years' experience located in Minneapolis, and Mr. Todd W. Lewis, who was associated with the Charles E. Lewis Company during the period involved, his company being buyers in securities and commodities, testified that they had made a complete study of these exhibits, and in the light of their view that conditions were fairly normal as to business on March 1, 1913, and considering the small inventory with accompanying reduced hazard and lesser insurance outlay, the small physical investment with resulting small depreciation, the absence of outstanding debt except current debts, the small credit risk involved in the receivables shown, the increase in the sale of the product, stability of the price charged and yearly earnings, reached the conclusion that the value of the stock outstanding on that date was approximately $20 per share, giving the company a value of approximately $12,000,000, which represented the capitalization of $600,000 yearly dividends at 5%, or twenty times earnings, and that the same was a conservative investment was the opinion of both witnesses.

Due to the fact that there were no sales of Cream of Wheat stock prior to March 1, 1913, in an effort to measure its fair market value the Government undertook a comparison of the sales prices in a fair and open market of comparable property. Montana Railway Co. v. Warren, 137 U.S.

348, 11 S.Ct. 96, 34 L.Ed. 681; East Shore Land Co. v. Metropolitan Park Commission, R.I., 86 A. 894; West View Cemetery Ass'n v. Commissioner, 5 Cir., 95 F.2d 714; Dayton Power & Light Co. v. Public Utilities Commission, 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267; Oxford Paper Co. v. United States, Ct.Cl., 52 F.2d 1008, supplemental opinion, 56 F.2d 895. "* * * the value of these stocks and bonds must be appraised by comparison with the values which the same and other like securities brought when sold at a 'fair voluntary sale.'" Bingham's Adm'r v. Commonwealth, 196 Ky. 318, 244 S.W. 781, 789.

In this connection the Government tendered as expert witnesses Mr. Fred Mason, for several years president of the Shredded Wheat Biscuit Co., Mr. John Alden Grimes, consulting engineer of the Bureau of Valuation, Internal Revenue Division, and Mr. Henry S. Henschen, a retired banker of wide experience. All of these witnesses gave full credit to the remarkable record of the Cream of Wheat Company, although none of them agreed with the policy which permitted the paying out of substantially all of the earnings as dividends; nor did they agree with the advertising policy, considering the expenditures therefor as too low.

Mr. Mason's view after an analysis of the exhibits and in the light of long years of active business experience with large corporations, was that the fair market value of the Cream of Wheat capital stock should not exceed eight times the earnings of 1912, or approximately $5,000,000. Mr. Grimes was also of the opinion that the stock in round figures should be valued at $5,000,000 and Mr. Henschen was of the view that the value of the Cream of Wheat stock should not exceed seven times earnings, or $4,300,000. All of these witnesses made comparative studies of the two competing companies whose figures were available and tendered in evidence, namely, Quaker Oats Company and the Shredded Wheat Biscuit Company. Of these two the evidence shows clearly that the Quaker Oats Company is much the larger. It had in 1912 five times more earnings than Cream of Wheat and the Shredded Wheat Company had one and one-half times more.

The evidence reflected by plaintiff's Exhibit A showed that on January 1, 1908, the aggregate of common stock, surplus and tangibles of the Cream of Wheat Company was $638,679.41. These items on February 28, 1913, or five years and two months later, totalled $664,347.10, a gain of $26,000 or approximately an average gain of $5000 per annum for these items. Mr. Henschen regarded such result as "a quite inadequate increase of its assets held for the protection of the future of the business and for the protection of continuous dividends." The earnings for the Cream of Wheat Company for 1912 were approximately $612,000 and its total tangible assets at that time were approximately $713,000. The Shredded Wheat Biscuit Company for the same period had earnings of $923,265, with net tangible assets of some $2,858,000, and the Quaker Oats Company had earnings in excess of $2,250,000 with net tangibles in excess of $7,000,000.

On the basis of the claimed-for valuation of $12,000,000, or $20 per share, with the net tangibles shown to be approximately $700,000 on March 1, 1913, the evidence shows good will to represent over 90% of the total value, or an amount in excess of $11,000,000. Mr. Henschen testified that he had never heard of a company in which the value of good will was as much as five years' earnings.

It was generally conceded that the Quaker Oats Company was not closely comparable to the Cream of Wheat Company but that there were many elements of comparison with the Shredded Wheat Biscuit Company. They were both single product companies, the product of both being a breakfast food made out of wheat and sold in packages. Both companies had registered trade marks, although the Cream of Wheat Company is not shown to have had any patent protection. The growth of each was almost wholly dependent upon advertising and both had as their principal competitor the Quaker Oats Company, the largest breakfast food company then doing business. Neither of said companies had any funded indebtedness on March 1, 1913. The business of both companies was subject to the same hazards, such as fluctuations in the price of wheat, competition, effectiveness of advertisements, and the like. The Quaker Oats Company on the other hand, measured by almost every standard, was many times larger than either of these two companies. It had unusually high commercial standing, able management and a diversified business both in foreign and domestic markets. There was active trading in its stock; it was bought by conservative investors and it was good col-

310

lateral for bank loans. It was shown that the fair market value of Shredded Wheat Company stock on March 1, 1913, was nine times its net earnings for the year 1912, whereas the Commissioner in this case assigned a value to Cream of Wheat stock of over ten times the net earnings of the company. The Quaker Oats Company stock at the same time was selling at 13.4 times earnings.

■ It is well settled that the phrase "fair market value" as used in the statute means the price at which a seller willing to sell at a fair price and a buyer. willing to buy at a fair price, neither under compulsion and both having a reasonable knowledge of the facts, would trade. Chicago Railway Equipment Co. v. Blair, 7 Cir., 20 F.2d 10. See also Words and Phrases, Vol. 5, First Series, page 4383.

There being no sales of this stock, the plaintiff insists that the only appropriate means whereby the fair market value can be obtained, is by the capitalization of the earnings method, while the Government contends that the fair market value in this case can be appropriately determined only by a comparison of other stocks in the same field and an analysis of all relevant factors. In Cumberland Pipe Line Co. v. Lewis, D. C., 17 F.2d 167, 171, which was a tax case, among other things, the court said: "* * * in applying the capitalizing of net income method, if it is applied correctly, one has to accept to a certain extent plaintiff's presentation as to the future, whereas, in using the stock method, he has the advantage of the judgment of the investing public."

In Griffiths v. Commissioner, 7 Cir., 70 F.2d 946, 948, the court said: "The importance of earnings over a considerable period of time is admitted. It is not, however, conclusive. * * * The effect of evidence of large earnings is at least partially offset by the low asset value of the corporation."

■■ It was the consensus of opinion of all of the Government witnesses that the presence of tangible assets provides. a cushion for the investor to fall back upon if business becomes depressed and credit becomes impaired. The tangible assets are at least salvage for the investor. This position seems both reasonable and sound. If good times possessed the character of permanency, a policy which paid all earnings out in dividends might be without

criticism. No reason seemingly would exist for the building up of a surplus or the acquisition of tangibles. But in determining the resistance or staying power of any company when distress comes, tangible assets as well as high earning power must be considered. The future is speculative as to any company. The stock of one buttressed with large tangible assets, a demonstrated borrowing capacity, a market where its shares may be sold, and a conservative dividend policy, is obviously less speculative than a stock possessing no market for its sale and where all the earnings are paid out in dividends and relatively the tangibles are inconsequential.

The witnesses for the plaintiff take. the position that there was nothing as of March 1, 1913, which would suggest an interruption of the ordinary business conditions then existing, and with the fine record of earnings a willing buyer would have nothing to fear for the future in paying twenty times earnings for the Cream of Wheat stock, irrespective of the absence of tangibles; and that the company having over a period of some five years demonstrated its capacity to increase its earnings yearly with a small investment, few tangibles, low operating costs, excellent management, and possessing a most unusual good will and the trade mark "Cream of Wheat", should have its value fixed solely in the light of such factors.

The record indicates a lack of availability of the stock as collateral for loans if they became necessary. Should business decline domestically or abroad, the price of wheat advance, or there occur an upset in public taste as to breakfast foods, or unlooked-for competition arise—what might one contemplating purchase of the stock reasonably apprehend? Stock assessment, or the difficulties attending the making or the floating of bonds or other mortgage debt upon the property to raise unexpectedly needed funds? Such factors in a country where experience before March 1, 1913, tells us that panics and cycles of depression do come and that all business suffers as a consequence thereof, should and no doubt would occur to such purchaser. The conservative investor looks. for elements which guard against the rainy day and which tend to preservation of the business and the maintenance of the dividend return. The speculative investor treats the large dividend as supporting the hope that future operations will continue.

to maintain such dividends with a consequent increase of stock value.

It is my conclusion that in arriving at what was the fair market value of Cream of Wheat stock on March 1, 1913, the Commissioner of Internal Revenue when he valued the stock at approximately ten times its earnings was right and he should be sustained. His findings are prima facie correct and in my opinion the greater weight of the evidence supports his conclusion as against plaintiff's claim of twenty times earnings representing the value of the stock. I think the defendants have fully carried their burden. See Wickwire v. Reinecke, 275 U.S. 101, 48 S.Ct. 43, 72 L.Ed. 184; Phillips v. Commissioner, 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289; Wells Amusement Co. v. Commissioner, 4 Cir., 70 F.2d 208; Old Mission Portland Cement Co. v. Commissioner, 9 Cir., 69 F.2d 676; Stiles v. Commissioner, 5 Cir., 69 F.2d 951.