### PLAUT v. SMITH, Collector of Internal Revenue.
### Civil Action No. 963.

United States District Court
D. Connecticut.
Jan. 6, 1949.

Raymond E. Hackett, of Stamford, Conn., for plaintiff.

Adrian W. Maher, U. S. Atty., of New Haven, Conn., E. J. Lonergan, Asst. U. S. Atty., of Hartford, Conn., and William B. Waldo, Sp. Asst. to Atty. Gen., for defendant.

HINCKS, Chief Judge.

This action grows out of a controversy over the valuation of common stock of the Lehn and Fink Products Corporation, hereinafter referred to as "L. F.",—a Delaware corporation engaged on a nation-wide scale in the business of manufacturing drugs, of selling the same at wholesale, and of selling at retail certain proprietary products.

During the year 1938 the plaintiff sold part of his holdings of L. F. common stock: from the sale he realized $133,836.50. In his income tax return for that year he reported that the shares thus sold had a cost basis to him of only $14,894.59. This cost basis, thus reported by the plaintiff voluntarily, he later asserted to be erroneous and filed a claim for refund in which it was contended that the true cost basis upon which his gain should be computed was $309,447. After the disallowance of this claim the pending action was duly filed.

The plaintiff's holding of L. F. stock had been acquired by specific bequest under the will of his father who had died in New York on June 17, 1915. At his death, the father had been the chief executive officer of L. F. and his business genius had been the major cause of its phenomenal growth. The only issue in the pending action is over the value of L. F. common stock as of that critical date. The tax collected had been assessed upon a valuation of $247.75 a share, which the Com-

missioner still contends to be right. The plaintiff, however, contends that as of the critical date the stock had a fair market value of $2942.94 or even higher.

At the beginning of the trial an important question of evidence was raised. The defendant pointed to Treasury Regulations 101 promulgated under the Revenue Act of 1938, which in Art. 113(a) (5)—1 (c) provided as follows:

"Fair market value.—For the purposes of this article, the value of property as of the date of the death of the decedent as appraised for the purpose of the Federal estate tax or if the property is not appraised as of the date of death of the decedent for such purpose or if the estate is not subject to such tax, its value as appraised as of the date of the death of the decedent for the purpose of State inheritance or transmission taxes, shall be deemed to be its fair market value at the time of the death of the decedent."

Relying on this Article the defendant offered in evidence a "supplemental stipulation" of facts from which it appeared that upon the death of the plaintiff's father his holdings of L. F. common stock had been appraised for purposes of New York Inheritance Tax and at that time, by a method of valuation applied to basic data set forth in said stipulation in considerable detail, the New York Surrogate found the stock to have a value of $247.75 per share.

This supplemental stipulation, over the plaintiff's objection, I held to be admissible and it was marked in evidence. In so ruling I did not hold that the plaintiff for purposes of measuring the gain on his sale in 1938 was concluded by the contemporary valuation made in 1916 for purposes of State Inheritance Tax. Indeed, counsel for the defendant expressly disclaimed any contention that the earlier valuation was conclusive for present purposes. My ruling implied only that the contemporary valuation was entitled to such weight as could properly be attributed to it in view of the method used and the amount and source of the basic figures to which the method was applied, all in the light of all the other evidence in the case including the opinion testimony of

the plaintiff's experts. And since the Commissioner adopted the valuation approved by the New York Surrogate it is a natural inference that he adopted also the method and basis upon which the Surrogate's valuation rested. I proceed, therefore, to compare and weigh the methods and constituent factors of the valuation now advanced by the plaintiff with the contemporary valuation approved by the Surrogate and now adopted by the Commissioner.

As to method, there is indeed a great similarity between the opposing positions taken. Each party advocates that the earnings attributable to intangible assets shall be ascertained by substracting from a selected over-all earnings-base the normal yield to be expected from the "capital employed" (Surrogate's method) or the normal yield to be expected from the "net working capital" (plaintiff's method);[1] and both suggest that the ultimate valuation be reached by capitalizing the earnings attributable to intangible assets as-certained as above and adding thereto the net worth of the tangible assets. By this method the plaintiff's expert arrived at a value of the common stock of $3,569.26 per share (if the earnings from intangibles be capitalized on a 10% basis) or of $2,-942 (if said earnings be capitalized on a 12½% basis); this, as against the valuation of $247.75 per share officially adopted by the Surrogate and Commissioner successively. The chief points of difference in method and in bases which produce results so widely disparate I will now review seriatim.

1. The Commissioner, by adopting the contemporary valuation approved by the Surrogate, takes as the over-all earnings-base the average of the five fiscal years ending on April 30, from 1911 to 1915 inclusive, except that in computing said average he adjusted downward the earnings of $357,382.27 for 1915 to $147,921.84 which was the amount of the 1914 earnings. This adjustment was made because of the view that as of the critical date the 1915 earnings (i. e., for the fiscal year ending April

30, 1915), which greatly exceeded those of any prior year, were attributable to non-recurrent factors and hence ought not to be reflected without discount in a base made for projection into the future.

Plaintiff's expert, on the other hand, disregards the desirability of averaging earnings over a number of years, and takes the record-breaking earnings of the single year 1915 (i. e., the fiscal year ending April 30, 1915) as his earnings-base

I thoroughly agree that the view implicit in the Commissioner's valuation that for use in a method which involves as a factor a forecast of future earnings based upon past earnings the earnings-base, where possible, should comprise a period of several years—preferably as many as five years—rather than rest upon the results of a single year. This, I think, is the generally approved method. White & Wells Co. v. Commissioner, 2 Cir., 50 F.2d 120; Robertson v. Routzahn, 6 Cir., 75 F.2d 537. To the extent that this method is reflected in the Commissioner's valuation I think the result more reliable than that obtained from plaintiff's method in which a single year was used as the earnings-base. Nor may the Commissioner's valuation be criticized for its mark-down of the 1915 earnings. As the evidence shows, there was sound basis for the view that the high level of 1915 earnings was due to abnormal conditions of possibly short duration, such as the profitable sale of merchandise imported from Germany no longer available for importation. With this factor in mind, the Commissioner might well have eliminated the 1915 earnings altogether from the averaged earnings-base. White & Wells Co. v. Commissioner, supra; Charles W. Ballard v. Commissioner, 25 B.T.A. 591; D. N. & E. Walter & Co. v. Commissioner, 10 B.T.A. 620. See also citations to text in Montgomery's Federal Taxes, Estates, Trusts and Gifts, 1947–1948, Page 164, and Paul on Federal Estate and Gift Taxation (1942), Vol. II, Pg. 1290–1291. Instead, to include in the averaged base earnings for 1915 at the 1914 level was an

---

[1] The meaning attributed to "net working capital" by plaintiff's expert is shown under Note 2 below.

adjustment favorable to the plaintiff as the 1914 earnings substantially exceeded those of every prior year included in the average.

2. The Commissioner's valuation reflected discounted values for several categories of assets, such as inventories, accounts and bills receivable, in accordance with the testimony given by L. F. executives before the Surrogate's appraiser in 1916. For instance, on representation of Company officials that on the basis of past experience a considerable volume of accounts receivable had proved to be worthless and that if liquidated the accounts receivable would be worth only 75 cents on the dollar, the Surrogate approved a valuation of this item in the amount of $336,048 and an aggregate valuation of all the corporate assets of $1,141,355.28. Plaintiff's expert, on the other hand, under instructions from counsel, disregarded these downward adjustments established by the contemporary testimony of company officials, and used instead unadjusted ledger values amounting to $448,064 and $1,399,-829.64, respectively.

On the resulting conflict in the treatment of these basic items, I am unable to find that the Commissioner's valuation was without the support of substantial evidence. Rogers v. Helvering, 2 Cir., 107 F.2d 394; Williams v. Commissioner, 8 Cir., 44 F.2d 467. On the contrary, it appears to me that a valuation in 1916 supported by contemporary evidence apparently authentic might be expected to have greater accuracy than a valuation constructed twenty-two years later. To be sure, as against the plaintiff the evidence taken before the Surrogate's appraiser was, technically, hearsay which but for Treasury Regulation 101 could not have been admitted into the record here. And because of its quality as hearsay I recognize the need of caution in relying upon such evidence. But here I note that the evidence was originally taken and apparently recorded in official proceedings having a distinct adversary flavor. And although it included testimony of witnesses not subject to cross-examination here, because the subject matter was the financial condition of Lehn & Fink and the witnesses

were L. F. officials if the testimony then had not been true it would presumably have been possible for the plaintiff, for aught that appears, to contradict and correct it by evidence in the trial here. And this has not been done; the testimony of L. F. officers in 1916 stands uncontradicted here. These considerations lead me to attach considerable weight to the contemporary and official valuation. Notwithstanding the hearsay quality of the basis shown therefor, I think it more reliable than the ledger values then standing unadjusted on L. F. books which was used by the plaintiff's expert in his valuation.

3. As already observed, broadly stated, the method of valuation contended for by both parties is to add the physical net worth of the corporate tangibles to the computed value of its intangibles. But in giving effect to this method the plaintiff's expert takes the figure of $437,648.82 as being the net worth as appearing on the corporate books. In fact, however, this figure was based on a balance sheet as of April 30, 1915. But thereafter and prior to the critical date a dividend of $200,000 was paid. Plaintiff's expert neither gave effect to this reduction of the corporate surplus nor explained his failure so to do. It results that to this extent his valuation was excessive. This conclusion is not altered by the suggestion that such a sizable dividend payment would necessarily tend to make the stock more attractive to prospective purchasers and hence produce a speculative value for the stock which would fully compensate for the reduction of the cash surplus by $200,000. But even the plaintiff's expert appeared somewhat vague in his support of this proposition and I am unable to accept its validity. Surely the corporation was not worth as much, even to speculators, without $200,000 in cash or the equivalent as with it.

4. When he came to ascertain the earnings of the tangible assets (which by subtraction from the total earnings would indicate the earnings attributable to the intangible assets), plaintiff's expert took as constituting the tangible assets the plant and machinery plus the corporate "working capital" which he defined as the net current assets (current assets less current

46

liabilities), *less the debentures and the preferred stock at par.* (Record, pg. 54) [2]

The Surrogate's appraiser, on the other hand, proceeded on the theory that the assets shown on the corporate balance sheet—real estate, machinery, furniture, merchandise inventory, securities, accounts and bills receivable and cash—all without offset contribute to the earnings from tangibles, so that the earnings presumably resulting from intangibles were those in excess of a 6% return on all the assets just

[2] Plaintiff's expert apparently took his basic figures from the chart marked "Exhibit D" attached to the main stipulation in evidence as Exhibit B. This shows as of April 30, 1915:

### Fixed Assets

| | |
|---|---:|
| Real Estate | $ 114,287.06 |
| Machinery, etc. | 33,797.04 |
| | $ 148,084.70 |

### Current Assets

| | |
|---|---:|
| Cash | $ 201,114.54 |
| Securities | 145,330.65 |
| Inventory | 542,342.42 |
| Accounts Receivable | 448,064.44 |
| Notes Receivable | 59,224.40 |
| Sundry Debts | 69,448.65 |
| | $1,465,525.10 |

### Current Liabilities

| | |
|---|---:|
| Accounts Payable | $ 131,539.34 |
| Accrued Interest | 10,000.00 |
| Sundry Creditors | 34,421.64 |
| | $ 175,960.98 |
| Net Current Assets: | 1,289,564.12 |
| | $1,465,525.10 |

| | |
|---|---:|
| Net current assets | $1,289,564.12 |
| Less: Preferred stock ($500,000) and Debentures ($500,000) | 1,000,000.00 |
| Net Working Capital, | $ 289,564.12 |

### Valuation by Plaintiff's Expert

| Earnings from Tangibles: | | Earnings attributed to Intangibles: |
|---|---:|---|
| Net working capital of $289,564.12 @ 6% | $17,373.85 | Total earnings for 1915: $342,382.27 |
| Plant & Machinery @ 8% | 11,846.78 | Less: earnings from Tangibles for 1915, 29,220.63 |
| Total earnings from Tangibles | $29,220.63 | |

Earnings attributed to Intangibles .......................$ 313,161.64

| | |
|---|---:|
| Capitalization of Earnings from Intangibles @ 10% | $3,131,616.40 |
| Plus: Net worth on books as of April 30, 1915, without reflecting dividend of $200,000 paid in May, 1915. | 437,648.82 |

Total value of corporation ...............................$3,569,265.22
or
Per Share, as of April 30, 1915 ..........................$ 3,569.26

mentioned.[3] And it is this difference of method which is the chief factor contributing to the enormous difference in result.

Having in mind that the immediate problem is to ascertain (as a preliminary step in the method) the earnings produced by assets other than intangibles, I see no basis for the plaintiff's position in offsetting against those assets the corporate debentures and preferred stock. For instance, obviously the productivity of the plant would not be affected either by the amount of its long-term fixed debt or by the investment represented by capital stock. No one disputes that when in the final step of this method of valuation, the capitalized value of the intangibles is added to the net worth of the tangibles, then indeed the net worth should be ascertained by subtracting from the total tangible assets all liabilities which stand prior to the common stock, including the debentures and preferred stock. But that is another—the final—step. The question now involved in this preliminary step of the method is not one as to net worth; it is rather one as to the volume of productive assets irrespective of fixed or of capital liabilities. And for purposes of this step to reduce the productive tangible assets by the fixed debt ($500,000) and the preferred stock ($500,000), as the plaintiff contends, would constitute an error of huge dimensions.

The Surrogate, on the other hand, fell into an error, though one of more moderate proportions, when he took as the productive tangible assets all the assets then on hand ($1,141,355.28) on the basis of his adjusted valuation (3) without offsetting the current liabilities, viz.: "Sundry Creditors" $158,697.15 and "General Reserve" $50,000, Total, $208,697.15. Exhibit H, Par. 35. This, I think, was a plain error of law. It apparently was recognized as such in a subsequent decision of the Surrogate's Court. In re Dupignac's Estate, 123 Misc. 21, 204 N.Y.S. 273, 282. There the Surrogate subtracted 6% of the *net* assets from the total averaged earnings to get the earnings from intangibles which —like the Surrogate here—he multiplied by a five years' purchase to reach the

Surrogate's Valuation
(Supplemental Stipulation, Exhibit H,
Paragraphs 34 and 35)

| | |
|---|---|
| "Capital employed" represented by assets as adjusted: | |
| Real Estate | $ 65,000.00 |
| Machinery and fixtures | 22,690.33 |
| Furniture and fixtures | 7,093.41 |
| Merchandise inventory | 443,990.70 |
| Universal Brush Co., Bonds | 20,000.00 |
| Accounts Receivable | 336,048.00 |
| Bills Receivable | 44,418.30 |
| Cash | 202,114.54 |
| | $1,141,355.28 |
| Earnings from "Capital employed" at 6% | $ 68,481.31 |
| Earnings attributed to Intangibles: | |
| Average earnings (adjusted) 1911–1915 | $ 131,500.44 |
| Less: Earnings attributed to capital employed | 68,481.31 |
| Earnings attributed to Intangibles | $ 63,019.13 |
| Capitalization of Earnings from Intangibles at 20% | $ 315,095.65 |
| Plus Net Worth, adjusted as of June 17, 1915, deficit, | −67,341.87 |
| Total value of Corporation | $ 247,753.78 |

Or per share, as of June 17, 1915, $247.75; a valuation which wholly disregards the existence as of the critical date of current liabilities of $208,697.15. (Exhibit H, Par. 35)

value of the good will.[4] And in Rogers v. Helvering, supra, the court speaks of the source of earnings from tangibles as the "net tangibles." Indeed, as a matter of reason quite apart from authority, it is plain that to the extent that an item, for instance, such as cash on hand on a particular date is needed to pay debts then due, it cannot be treated as an asset available for the production of earnings.

5. The Commissioner's valuation was based upon the capitalization of earnings attributable to intangibles at a 20% rate; that is to say, at a five years' purchase. The plaintiff's expert, however, suggests a 10% or a 12½% rate. This difference, of course, is basically a matter of judgment dependent upon the facts. In re Dupignac's Estate, supra. I find not even a preponderance of evidence to show that even the more conservative of the two rates mentioned by the plaintiff's expert has any greater validity than the 20% rate adopted by the Commissioner apparently on the strength of the contemporary valuation approved by the Surrogate. On the contrary, the rate used in the contemporary valuation appears to me the more reliable. It imports that experts carrying an official responsibility, whose minds were untouched by the hindsight which now we find it hard to disregard, then considered the business future so uncertain that a prospective purchaser would not count upon the earnings from the intangible assets of such a business to continue at the 1911-1915 level for more than five years. However that may be, certainly in the light of all the evidence it cannot be said that the Commissioner's estimate on this point was arbitrary and illegal. Indeed, it appears to have been in line with that of Appeals and Review Memorandum 34, stated and discussed in Montgomery's Federal Taxes,

Page 617, and Paul on Federal Estate and Gift Taxation, Vol. II, Sec. 18.31.[5]

## The "Comparative" Method.

As an alternative method of valuation, the plaintiff's expert proposed to apply to L. F. earnings for 1915 the average ratio between earnings and selling price of fourteen stocks for which there had been an actual market at the critical date. The earnings of each of the corporations used in the comparison were those for the calendar year 1914 or for the last fiscal year prior to the critical date. This averaged ratio when applied to the L. F. earnings for 1915 indicated a hypothetical selling price of $3,499.69 per share for L. F. common stock which the plaintiff now claims must be substituted for the figure adopted by the Commissioner.

It is true that since 1943 a provision of the Internal Revenue Code, 26 U.S.C.A. § 811(k), has provided that a determination of the value of the unlisted stock for estate tax purposes shall take into consideration, "in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange." It will be noted, however, that when the plaintiff's witness sought to apply this statutory method of valuation the ratio established for the fourteen companies included in his comparison was in each case based upon a single year's earnings, and when so established was applied to the earnings of plaintiff's company for a single year, viz., the year ending April 30, 1915. But there was nothing in the evidence to show that any of the corporations used in the comparison had enjoyed such an extraordinary step-up of earnings in the year used for the purposes of comparison as had been enjoyed by L. F. in 1915. Nor

---

[4] In this case, when on page 282 of 204 N.Y.S., the Surrogate said "six per cent of the average *net income* is $426,612.77" he meant "six per cent of the averaged *net assets*," as is plainly shown by the figure used. And similarly when, also on page 282 of 204 N.Y.S., he speaks of "$919,750.-94 as the average *net profit*" he plainly meant earnings from intangibles.

[5] It should be noticed that at this step in the method the problem is to select an appropriate rate of capitalization not for the over-all earnings but only for earnings from intangibles. Consequently the cases cited by the plaintiff, as follows, are not applicable on this precise point. Rheinstrom v. Willcuts, D.C., 26 F.Supp. 306; DuPont v. Deputy, D.C., 26 F.Supp. 773; Laird v. Commissioner, 38 B.T.A. 926.

was there expert testimony or other evidence to show that generally, notwithstanding violent fluctuations in the earnings level, the ratio between earnings and selling price still remains constant; on the contrary, there was substantial evidence the other way. Indeed, it is hard to see how a positive likelihood of a distorted result from this method of valuation can be avoided unless the base-period is extended over a period of years, as was suggested in White & Wells v. Commissioner, supra. See also Griffiths v. Commissioner, 7 Cir., 70 F.2d 946; Rheinstrom v. Willcuts, D.C., 26 F.Supp. 306. For these reasons the defendant has good ground to criticize the application which the plaintiff gives to this method.

In another respect, however, the valuation based upon such an application of the method is not merely of doubtful weight; it is positively invalid. For there was no evidence from which it could be found that the corporations used for purposes of comparison "were engaged in the same or a similar line of business" as was plaintiff's corporation. Oxford Paper Co. v. United States, 56 F.2d 895, 74 Ct.Cl. 295; Rheinstrom v. Willcuts, supra; Harter Bank v. Com'r, 38 B.T.A. 387. The plaintiff's expert does not question this absence of business similarity; instead, he seeks to justify the selection of these particular corporations on the ground that since the data essential for the comparison was not available in connection with corporations engaged in a similar business, he selected corporations which like L. F. enjoyed substantial earnings from intangibles. It would appear to me that for purposes of valuation such a similarity would be wholly without real significance; that on such a basis a selection could be made seemingly supporting any result which might be desired. The sense of such a method was supported neither by citation of authority nor by argument. Plainly, the method is not that of the statute above cited. Certainly I cannot take a result resting upon such an unsubstantial basis as sufficient to destroy the presumption of correctness of the Commissioner's valuation.

Lastly, the plaintiff offers a valuation also based upon a comparison with the same fourteen corporations but reached by the application of an averaged ratio between price and dividends. In applying this method also, plaintiff's expert based the ratios upon the dividend payments and sales prices of a single year. The method so applied is therefore subject to the same weaknesses and defects which, as just pointed out, infect that using a price-earnings ratio.

This method is peculiarly inapposite for application to L. F. because of the lack of any consistent dividend policy on the part of that corporation. For the L. F. record of dividend payments for fiscal years ending April 30 was as follows: 1911, none; 1912, $20,000; 1913, $100,000; 1914, $100,000; 1915, $200,000; and on May 23, 1915—a date shortly before the death of Albert Plaut—$200,000 which was paid in large part from proceeds of the sale of marketable securities. Surely a prophecy of a hypothetical sales price based upon such a dividend history would be sheer conjecture. Cf. Bank of California v. Commissioner of Internal Revenue, 9 Cir., 133 F.2d 428. Especially is that so when one considers that this corporation was controlled by a single family and owned by only two common stockholders so that, consequently, even assuming that earnings continued there was no assurance of any continuity of dividend policy: dividends could be paid or passed according to the needs or desires of the two owners. All in all, I agree with the defendant that a valuation having such a base was so largely a matter of sheer conjecture that it failed to outweigh the presumption of correctness pertaining to the Commissioner's valuation.

In conclusion, I hold that the method of valuation made by the Surrogate and adopted by the Commissioner was in all respects valid and in accord with the great weight of the evidence save as to the error discussed above in Point 4 of this opinion. In accordance with that discussion I hold that the Commissioner's valuation was erroneous in that it was based upon an assumption that the earnings from the tangible assets might be measured by computing a 6% return on all the tangible assets in the balance sheet without offset

of the current liabilities. As a result of this error the earnings from intangibles were understated to the extent of $12,521.82 [6] and the over-all valuation on the very basis of the five years' purchase proposed by the Surrogate was understated to the extent of $62,609.10. This understatement amounted to $62.61 per share on the stock outstanding as of the critical date.

To require such an adjustment is not to substitute the judgment of the court for that of the Commissioner as to any matter of fact. It is rather the correction of an error of law necessitated by the very same facts as those upon which the official valuation was based. With the facts standing undisputed in the record, the correction based thereon is within the power of the court. Forbes v. Hasset, D.C., 38 F.Supp. 62, reversed on another point, 1 Cir., 124 F.2d 925. And the strict burden of proof required of one who seeks a recovery of taxes is fully satisfied. Mahler v. Commissioner, 2 Cir., 119 F.2d 869.

A judgment for the plaintiff in accordance with the foregoing conclusions may be submitted.

---

[6] This figure derives from the L. F. Statement of Assets and Liabilities as of June 17, 1915, as furnished to the Surrogate's appraiser. This showed current liabilities ("Sundry Creditors" and General Reserve) of $208,697.15, 6% of which amount to $12,521.82. (The figures for current liabilities mentioned above under Point 4, Note 2 above, were there used by plaintiff's expert and were taken from a statement as of April 30, 1915, Ex. B, Chart D.)