John J. LOUIS, Jr., and Harris Trust & Savings Bank, Executors of the Will of John J. Louis, Deceased, Plaintiffs-Appellees,

v.

UNITED STATES of America, Defendant-Appellant.

No. 15610.

United States Court of Appeals Seventh Circuit.

Nov. 15, 1966.

**264**

Mitchell Rogovin, Asst. Atty. Gen., Harry Marselli, Atty., Tax Div., U. S. Dept. of Justice, Washington, D. C., Edward V. Hanrahan, U. S. Atty., Chicago, Ill., Lee A. Jackson, David O. Walter, Rufus E. Stetson, Jr., Attys., Dept. of Justice, Washington, D. C., for appellant.

Clarence E. Fox, Chicago, Ill., William S. Bodman, Sheldon Lee, C. William Pollard, Chicago, Ill., for appellees, Wilson & McIlvaine, Chicago, Ill., of counsel.

Before KNOCH, KILEY and FAIRCHILD, Circuit Judges.

KNOCH, Circuit Judge.

The defendant-appellant, the United States of America, has appealed from a judgment entered against it in an action brought by the plaintiffs-appellees, John J. Louis, Jr. and Harris Trust & Savings Bank, Executors of the Will of John J. Louis, deceased, to recover alleged overpayment of federal estate tax on the estate of the decedent.

The appellant contends that the District Court erred in denying its motion for a new trial.

At his death on February 19, 1959, the decedent John J. Louis, owned 235,000 shares of S. C. Johnson & Sons, Inc., commonly known as Johnson's Wax Company, hereinafter called the "company." A timely federal estate tax return had been filed by the executors showing tax due in the amount of $532,534.97, which was paid. The executors valued the shares at $3.25 as of the date of death.

On audit, the government proposed to increase the valuation of the shares to $11.50 per share. After a conference, the government proposed to value the shares at $5.50 per share. The executors paid an additional federal estate tax of $205,838.78, plus interest of $33,812.-31. Subsequently, deficiency was assessed in the amount of $1,621,982.61, on a basis of $20 per share. This was paid with interest of $298,889.17 on June 24, 1962. When claim for refund was denied, suit was brought in the United States District Court to recover the additional amount paid because of the increase in valuation.

The issue of the value of the stock for federal estate tax purposes was tried before the jury who set the value as of the date of death at $5.34 per share.

There is no question that the record provides ample support for the jury's verdict. The taxpayers presented an impressive array of expert witnesses, including the former chief inheritance tax officer of the State of Illinois who had accepted the figure of $3.25 on behalf of the State, who described in detail the manner in which they arrived at their valuations, which varied from $3.25 to $6, together with display of large, easily read charts which simplified the process for the jury.

The government's expert witnesses, on the other hand, used as "comparables" a number of prosperous, well-known concerns whose stock was listed on the stock exchange, many of which were much larger than this company, on the theory that they were in the same or similar line of business, although as the jury must have known, many were in the drug or packaged food business. Plaut v. Smith, D.Conn., 82 F.Supp. 42, 48–49, affd. sub nom Plaut v. Munford, 2 Cir., 1951, 188 F.2d 543, 546. They ignored such elements as dividends. One witness applied his formula to Colgate-Palmolive as though its price were unknown and produced an error of almost 50%.

The government argues, however, that it did not have a fair trial free of prejudicial error. In seeking a new trial, the government relies on two grounds:

First, that the Court committed error in allowing the taxpayers to rely on a sale occurring more than two years prior to the evaluation date, in alleged violation of the Court's own pretrial ruling; and

Second, the alleged misconduct of counsel for the taxpayers.

██ In the course of pretrial proceedings it was conceded that the $5.50 valuation (on which additional sums had been paid by the executors in the belief that the case had been settled) was not a final determination and was not binding on the government. That figure had been approved in the District office but had been rejected by the Regional office. The government contends that this proposed settlement figure was improperly brought to the attention of the jury with its prejudicial suggestion that the government really thought that the fair market value of the stock did not exceed $5.50 per share.

One of the witnesses for the taxpayers, William H. Froembgen, vice-president of the Harris Trust & Savings Bank, testified concerning his lengthy experience in probate and estate administration, particularly in the valuation of the stock of closely held corporations. He described his supervision of the administration of the Louis estate and how he valued the stock of the company, listing the criteria employed, such as the small minority interest involved (less than 6%), the principal stockholder owning more than 50% of the voting stock; the payment of only one dividend (25¢ per share) in the past five years; the fact that none of the stock was ever publicly held; and the absence of market for resale.

He also testified to the steps taken to pay the estate taxes. He was asked whether there was not an additional assessment in February or March, 1963, and he said there was one for additional tax, which had been paid. He stated that the total amount of $239,641.09 was paid on February 14, 1963, which he explained was computed on a value of $5.50 per share. He testified that he did not agree with this valuation but paid it only to stop the running of interest. There was no objection to this testimony at the time.

The following day, the Court sustained the government's objection to admission in evidence of a letter dated March 6, 1963, signed by the District Director, showing proposed adjustment in the tax liability on a valuation of $5.50 per share. The government argued that this letter incorporated a proposal of settlement which was never consummated.

The Court upheld the objection on the further ground that the proferred exhibit tended to cloud the issue because it was not clear whose offer it was, and because it was redundant, as uncontroverted and undenied evidence was already in the record that a further sum had been paid on the basis of $5.50 per share.

The government then moved to strike the evidence of the day before concerning the $5.50 figure. Government counsel stated that the motion was not made earlier because, at the time, it did not appear that the "rather tangential" reference to $5.50 had made any adverse impact on the jury. Now, in view of the Court's reference to the evidence as uncontradicted, counsel wished the jury to be instructed to disregard it. The Court

thought such instruction would merely call the jury's attention to the figure, but government counsel expressed concern that otherwise the plaintiffs' counsel would be permitted to argue about the figure, to which the Court replied, "I would think that he would."

This foregoing argument was conducted out of the hearing of the jury. The government's motion to strike was not granted, nor was it renewed.

However, when counsel for plaintiffs did refer to the figure in his closing argument, as one of the bases on which the various payments of tax were made, the Court sustained the government's objection. The figure was thus mentioned to the jury on only two occasions. At no time were they told that it originated with the government, although the government contends that the jury must have concluded that this was the government's figure. We believe that any possible prejudicial effect was dissipated by the Court's flat statement when sustaining the objection:

"* * * the record is that you, the estate, claims the stock is worth $3.25, and the government claims it is worth $20.00 a share. Anything in between is of no consequence."

and

"You may * * * show how much the estate paid altogether, and then argue how much they want to get back * * *"

■ The government argues that it was deprived of a fair trial by comments and interjections indicating that neither the widow nor the decedent's three children had received any distribution and that distribution to them depended on procuring a refund.

The government explains that it sought to test Mr. Froembgen's familiarity with the actual administration of the estate because he claimed he had supervised and participated in the administration of the estate. He was asked if the will had been followed in making distribution to Mrs. Louis, the widow. Mr. Froembgen answered that she had re-

nounced and that she took a third by operation of law.

Whatever was the motive of the government in initiating this line of inquiry, the anxiety of the taxpayers' counsel lest the jury be misled into believing that distribution had been made is understandable. Earlier Mr. Froembgen had testified that he sold all the marketable securities left in the estate and pledged the rest to borrow the money to pay the tax. Government counsel asked the Court to admonish taxpayers' counsel to refrain from remarks and the Court did say, "Yes, let's get on with the lawsuit."

Accordingly, the following day, without objection, taxpayers' counsel elicited testimony on redirect examination that the widow and children received no distribution. This was not mentioned in closing argument. We find no error in this regard. United States v. Regents of New Mexico School of Mines, 10 Cir., 1950, 185 F.2d 389, 391.

It is not disputed that evidence of actual sales reasonably near the date of valuation is reliable and admissible as proof of value.

■ The taxpayer produced proof of a sale of 90,000 shares by the decedent, John J. Louis, at $4.49 per share, within two years, three months of the valuation date, during which time the financial condition and earnings of the company had not materially changed. The Court declined to instruct the jury that this was an isolated transaction, too remote in time for consideration and not at arms length.

This sale was alleged in the Complaint. In its answer the government denied knowledge of it. In pretrial on May 3, 1965, while the circumstances of this sale were being discussed, counsel for the government stated that he would ask for an instruction to the jury to disregard this sale, stating that the government would cut the ground right out from under it.

The government now asserts that no further investigation of the circumstances of this sale was made because

the government was led to believe that the sale would be excluded from the proof offered at the trial.

The government relies on the ruling made in connection with a deposition taken from John Louis, Jr., later that same month, May, 1965. Mr. Louis, Jr. was asked how many shares of the company stock he himself owned. His counsel instructed him not to answer. In oral argument of this point before the Court, taxpayers' counsel admitted that it would be competent to ask Mr. Louis about sales. He asked for no specific time limitation. The Court stated that the government was entitled to inquire into evidence within a two-year period of the date of the death, saying "but I have restricted it to that."

The colloquy may have given rise to some confusion as to exact application of the restriction, but the Court did clarify it when he summarized his ruling as follows:

> "You will limit your questions of all kinds as to how many he owns, how many he owned during this period, how they were acquired and what the basis for some statement of his which may be a statement against interest in regard to value of the stock or gift tax purposes."

The government then proceeded to ask Mr. Louis, Jr., questions about gifts of shares, all of which were answered. He was also asked whether in arriving at the figure of $3.25 for purposes of the estate tax return he took into consideration any sales outside of the two-year period and he stated that he knew of all the sales and must have had them in mind. He also said that he did not consider anything after his father's death. No objection was made by plaintiff's counsel to this testimony.

The government contends that the plaintiffs also initially interpreted the two-year period as applicable to all sales because of objections interposed when Mrs. Louis's deposition was taken. However, the record shows that the question asked of Mrs. Louis, to which objection was made on the basis of the time limit, concerned ownership of stock by her children, as to whether they owned it outright or whether it was held in trust for them.

When the deposition of Howard M. Packard, president of the company, was taken, the government asked him about sales of the company's stock and the formula followed in determining valuation. When the government later called him as its own witness, at the trial, he was examined on the subject of sales during the period from 1956 through January, 1959. He was specifically asked about the Louis sale.

Even if the government were surprised by admission of evidence of the Louis sale, that evidence appeared early in the trial. The government's experts testifying about a week later could have included it in their evaluations. Some of the testimony of Charles F. Glore, one of the government's expert witnesses, seems to support the government's contention that the fact of the Louis sale was unknown to him and that it might have made a difference in his calculations, but the same witness later said that he had read Mr. Packard's deposition so that the fact of the sale was known to him. He also expressed the opinion that sales to employees in privately-held companies, such as this sale was, had no bearing on determination of fair market value.

One of the plaintiffs' exhibits was a tabulation of all sales between July, 1956, and January 1959, including the Louis sale in question. The government refused to agree to its admission in evidence. However, in cross-examining Mr. Froembgen, the government asked him about this exhibit, which had not at that time been admitted. Plaintiffs' counsel reminded government counsel that he had not agreed to that document, whereupon the latter said "Now I agree to it." The exhibit was accordingly offered and accepted in evidence, the Court first expressly asking government counsel, " * * * and you have no objection?" to which the reply was "I certainly won't."

The government contends that the exhibit tended to nullify the prior testimony about the Louis sale rather than to support it because the tabulation showed that all transactions were completed at a formula price. However, the exhibit did bring the figures clearly to the attention of the jury without objection and at the instigation of the government. Cordle v. Allied Chemical Corp., 6 Cir., 1962, 309 F.2d 821, 825.

We have carefully considered all other points raised by the government, but we find them lacking in merit. We find no such abuse of discretion by the Trial Judge in denying the motion for a new trial as would justify our reversal and remand of this cause. Jennings v. Murphy, 7 Cir., 1952, 194 F.2d 35, 38. Nor do we consider this case to be so close on its facts that the allegedly improper comments of counsel might have caused the jury to hold for the taxpayers when they would otherwise have held in favor of the government. Stanczak v. Pennsylvania R.R. Co., 7 Cir., 1949, 174 F.2d 43, 48.

The judgment of the District Court is affirmed.

Affirmed.